UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                      Civil Action No. 15-13331

BAYER CROPSCIENCE LP,

       Defendant.

MEMORANDUM OPINION AND ORDER

Pending is the unopposed motion filed by the United States of America on November 25, 2015, to enter the proposed consent decree that was filed with the court, together with the joint motion of the parties to amend, filed on April 22, 2016, to substitute appendices to the proposed decree.

I.   Background

A.

Defendant Bayer CropScience LP ("Bayer") operates a facility in Institute, West Virginia ("the Institute Plant"), where it manufactures various agricultural products, including insecticides.  Daniel Decl. ¶ 9.  In 2008, when the events leading to this action occurred, Bayer had several operations at the Institute Plant involving chemicals classified as "extremely

hazardous substances" under the Clean Air Act.  See Shabazz
Decl. ¶ 9 (referring principally to 42 U.S.C. § 7412(r)).

On August 28, 2008, a "runaway chemical reaction"
occurred inside a pressure vessel at the Institute Plant.  Id. ¶
7; Mannan Report, p. 13.  The vessel was situated in a part of
the plant where the chemical methomyl -- a component of Bayer's
insecticide "Larvin" -- was being manufactured.  Shabazz Decl. ¶
7; see also Hunt Decl. ¶ 9.  The vessel eventually exploded,
causing an intense fire in the plant.  Shabazz Decl. ¶ 7.  Two
employees were killed and more than 40,000 area residents were
endangered.  Id. at ¶ 7; Daniel Decl. ¶ 8.  Further, debris from
the explosion struck a ballistic shield protecting a tank of
methyl isocyanate, the chemical involved in the 1984 Bhopal
disaster, although it did not puncture the tank.  Hunt Decl. ¶
9.

The explosion and fire occurred during the startup of
Bayer's methomyl production unit, which had been shut down for
several months while various pieces of equipment were replaced.
Id. ¶ 16.  During the startup, some safety measures were ignored
or overridden in an apparent effort to speed up the heating
process and get the unit back on-line.  Id.  In concert with
other problems during the startup, the safety overrides are

2

believed to have led to the runaway reaction that caused the explosion.  Id.

The EPA, the federal Chemical Safety and Hazard Investigation Board ("CSB"), the Occupational Safety and Health Administration ("OSHA"), and the West Virginia Department of Environmental Protection ("WVDEP") each opened investigations into the cause of the blast.  Id. ¶¶ 8, 10-14.  On February 26, 2009, OSHA issued a citation for violations concerning the methomyl unit, citing problems with standard operating procedures, training, annual certifications, inspections, and hazard control.  Id. ¶ 12.  OSHA assessed a civil penalty of $ 143,000.  Id.

In January 2011, CSB issued a report which concluded that "the runaway chemical reaction and loss of containment of the flammable and toxic chemicals resulted from deviation from the written start-up procedures, including bypassing critical safety devices intended to prevent such condition."  Id. ¶ 4; Mannan Report, pp. 13-20.  Meanwhile, inspectors from the United States Environmental Protection Agency ("EPA"), including Mikal Shabazz, inspected the Institute Plant three times between 2008 and 2012.  See Shabazz Decl. ¶ 8.  In addition, EPA reviewed the findings in CSB's incident report and OSHA's citation.  Hunt Decl. ¶ 17.

3

Bayer did not reopen the Institute Plant's methomyl unit following the explosion. Daniel Decl. ¶¶ 13-16. It has since limited its use of extremely hazardous substances at the Institute Plant, and now buys methomyl from suppliers rather than producing it itself. Id.

### B.

On September 21, 2015, the United States initiated this civil action with the filing of its complaint. See Compl., p. 1. In the complaint, the Government seeks civil penalties and injunctive relief for alleged violations of sections 112(r)(1) and 112(r)(7) of the Clean Air Act, 42 U.S.C. §§ 7412(r)(1), (r)(7), and the Chemical Accident Prevention Provisions found at 40 C.F.R. part 68. Id. at pp. 14-32.

On the same day that it filed the complaint, the United States filed the proposed consent decree. In accordance with 28 C.F.R. § 50.7, the United States published notice of the proposed consent decree in the Federal Register on September 25, 2015. See 80 Fed. Reg. 57,873-74 (Sept. 25, 2015). No comments were received by the expiration of the thirty-day comment period announced in the original notice. Subsequently, on November 25, 2015, the United States moved to enter the proposed consent decree. Bayer filed a brief in support of entry on December 9, 2015.

On March 18, 2016, the United States filed a notice of the parties' intent to amend the proposed consent decree.  The notice was followed by a motion, filed by the parties jointly on April 22, 2016, to substitute appendices to the previously-filed proposed consent decree.  See Mot. to Amend, pp. 2-4.  Upon review, it is apparent that the changes to be made to the appendices are without exception minor and immaterial to the substance of the decree.  The court concludes that, because of the limited changes made to the appendices of the proposed consent decree, and because there were no public comments on the original consent decree, public comment on the modified appendices is not necessary.  Consequently, the court ORDERS that the parties' motion to amend be, and it hereby is, granted.

C.

Notwithstanding the parties' proposed amicable resolution of this action, it is incumbent upon the court to assure itself of subject matter jurisdiction.  See, e.g., Bragg v. W. Va. Coal Ass'n, 248 F.3d 275, 299 (4th Cir. 2001) (noting a "district court's power to enter . . . [a consent] decree depend[s] on its having subject matter jurisdiction over the case").

To that end, 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil

actions arising under the Constitution, laws, or treaties of the United States."  Relatedly, 28 U.S.C. § 1345 provides pertinently that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."  Finally, 28 U.S.C. § 1355(a) provides materially as follows:  "The district courts shall have original jurisdiction . . . of any action . . . for the recovery . . . of any fine, penalty, or forfeiture . . . incurred under any Act of Congress. . . ."  Upon review of the pleadings and the evidence, it is apparent that the court has jurisdiction over the subject matter of this action pursuant to section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

## II.  Governing standard

Because "a consent decree 'has elements of both judgment and contract,'" it is "subject to 'judicial approval and oversight'" generally not necessary when dealing with private settlements.  Szaller v. Am. Nat. Red Cross, 293 F.3d 148, 152 (4th Cir. 2002) (quoting Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 279-80 (4th Cir. 2002)); see also Local No. 93, Int'l Assn. of Firefighters, AFL-CIO v. Cleveland, 478 U.S. 501, 519 (1986) and United States v. ITT Continental Banking Co., 420

6

U.S. 223, 237 n. 10 (1975) (same). This is because unlike a
private settlement, a consent decree becomes part of the court's
order, and the court retains jurisdiction over the parties and
the case for the duration of the consent decree. See Smyth, 282
F.3d at 279 (quoting Buckhannon Bd. and Care Home, Inc. v. W.
Va. Dep't of Health and Human Svcs., 532 U.S. 598, 604 n. 7
(2001)).

The Fourth Circuit explained in Smyth the particular
things that a court is expected to scrutinize in a proposed
consent decree, and the particular findings the court is to make
prior to entry. See id. at 280. Specifically,

> [b]ecause [a] consent decree does not merely validate a
> compromise but, by virtue of its injunctive provisions,
> reaches into the future and has continuing effect, its
> terms require more careful scrutiny. Even when it
> affects only the parties, the court should . . . examine
> it carefully to ascertain not only that it is a fair
> settlement but also that it does not put the court's
> sanction on and power behind a decree that violates
> Constitution, statute, or jurisprudence.

Id. (quoting United States v. City of Miami, 664 F.2d 435, 441
(5th Cir. 1981) (Rubin, J., concurring)). At bottom, "a court
entering a consent decree must examine its terms to ensure they
are fair and not unlawful." Id.

The standards governing consideration of a proposed
consent decree are elucidated further in United States v. North

7

Carolina, 180 F.3d 574, 581 (4th Cir. 1999).  To wit, "[i]n considering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are encouraged."  Id. (quoting Flinn v. FMC Corp., 528 F.2d 1169, 1173 (4th Cir. 1975)).  Nevertheless, "before entering a consent decree the court must satisfy itself that [] the agreement 'is fair, adequate, and reasonable' and [] 'is not illegal, a product of collusion, or against the public interest.'"  Id. (quoting United States v. Colorado, 937 F.2d 505, 509 (10th Cir. 1991)).  In examining the fairness and adequacy of a proposed consent decree, the court must consider the strength of the plaintiff's case.  See Flinn, 528 F.2d at 1172-73.  "While this assessment does not require the court to conduct 'a trial or a rehearsal of the trial,' the court must take the necessary steps to ensure that it is able to reach 'an informed, just and reasoned decision.'"  North Carolina, 180 F.3d at 581 (quoting Flinn, 528 F.2d at 1172-73).  In addition, "the 'court should consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement.'"  Id. (quoting Carson v. American Brands, Inc., 606 F.2d 420, 430 (4th Cir. 1979) (en banc) (Winter, J., dissenting), adopted by 654 F.2d 300, 301 (4th Cir. 1981) (en banc) (per curiam)).

III.   **Discussion**

A.

        The proposed consent decree undertakes to resolve the
United States' civil claims against Bayer, at least up to
September 21, 2015.  See Proposed Consent Decree ("Decree") §
XIII.  In exchange, Bayer agrees to pay a civil penalty and
submit to specified injunctive relief, and also to perform
several specified "supplemental environmental projects."[1]  The
civil penalty consists of a cash payment of $ 975,000 and
Bayer's commitment to perform specified supplemental
environmental projects with an estimated cost of $ 4,230,819.
See id. ¶ 8, § VII, respectively.

        Regarding the proposed injunctive remedies, the
proposed consent decree provides that Bayer will attempt to
reduce instances of non-compliance with standard operating
procedures, see id. ¶ 11, develop procedures for EPA-approved
self-assessments at certain facilities, id. ¶¶ 12-13, and

---

1  A "supplemental environmental project" is "an environmentally
beneficial project or activity that is not required by law, but
that a defendant agrees to undertake as part of the settlement of
an enforcement action." U.S. EPA, Supplemental Environmental
Projects Policy (2015 Update), p. 1.  The policy goes on to explain
that supplemental environmental projects "are projects or
activities that go beyond what could legally be required in order
for the defendant to return to compliance, and secure environmental
and/or public health benefits in addition to those achieved by
compliance with applicable laws." Id.

9

continue to operate its remaining processes at the Institute Plant as if they were regulated under section 112(r)(7) of the Clean Air Act, even though it no longer has processes there subject to this statutory provision, id. at ¶ 14. The requirements apply not only to the Bayer facility at Institute, but also to the following Bayer facilities across the United States, as set forth in the proposed consent decree:

- The Institute Facility;

- Bayer's facility at 8400 Hawthorne Road, Kansas City, Missouri;

- Bayer's facility at 1740 Whitehall Road, Muskegon, Michigan;

- Bayer's facility at 1500 East Delano Avenue, Littlefield, Texas;

- Bayer's facility at 103 Erskine street, Lubbock, Texas; and,

- "[A]ll facilities built or purchased by [Bayer] after the effective date of this consent decree until the decree is terminated pursuant to Section XIX. . . ."

Decree ¶ 7.1.

Bayer is required to report on its progress every six months until the termination of the consent decree. Id. ¶ 70. As set forth in Section XIX, the decree does not terminate until

a time after ten years from its effective date, and then only upon the defendant having complied satisfactorily with all requirements thereunder, together with the court's approval. Until termination of the consent decree, the court will retain jurisdiction over the case for the purpose of resolving disputes under, modifying the terms of, or enforcing the consent decree. Id. ¶ 83.

B.

In determining whether the proposed consent decree is fair, adequate and reasonable, the court has considered the entirety of the revised submissions.

The court begins its analysis bearing in mind the general principle that settlements are valuable and should be encouraged. See North Carolina, 180 F.3d at 581. Settlement also avoids the pretrial and trial events that would otherwise have consumed a significant amount of time and expense by the parties, including the public fisc, along with a substantial redirection of judicial resources. Id. That is particularly the case here, where the proposed consent decree is sponsored by the environmental regulator authorized by Congress to enforce the federal laws allegedly violated. See Gov. Mem., p. 1. Indeed, the court has previously observed as follows:

11

>The EPA and DEP are governmental agencies that employ individuals specially trained and familiar with the relevant scientific disciplines and governing law. The decision to avoid what might well have been a costly and time-consuming diversion of limited agency resources appears to have been a reasonable one under the circumstances.

United States v. Patriot Coal Corp., No. 2:09-0099, 2009 WL 1210622, at *5 (S.D. W. Va. Apr. 30, 2009) (Copenhaver, J.).

In examining the strength of the United States' case, the extent of discovery that has taken place, the stage of the proceedings, and the experience of counsel who negotiated the settlement, the court looks to the declarations and reports in the record for the necessary information. In sum, the record indicates that the United States and counsel for defendant engaged in years of arm's length negotiations and had the opportunity to explore each other's positions at length. See Hunt Decl. ¶¶ 8-17, 20-23.

Negotiations were conducted by qualified counsel for each party, who relied on engineers, from both EPA and Bayer, with technical knowledge to develop opinions on appropriate relief. See Gov. Mem., pp. 5-6 (detailing the experience for counsel for the parties). Further, the EPA, along with the other federal and state regulators involved in the

12

investigation, performed numerous inspections of the Institute
Plant in the months and years following the 2008 blast.  <u>See</u>
Shabazz Decl. ¶¶ 7-8.  All told, the proposed consent decree is
the product of several years of investigations and more than two
years of negotiations.  <u>See</u> Hunt Decl. ¶¶ 20-23.  Although the
parties were reasonably cooperative throughout, there is no
indication in the record that the proposed consent decree is the
product of collusion between the Government and Bayer.

        The proposed consent decree is a legal one.  In order
to provide for the consistent development of proposed penalties
utilizing the statutory factors set out in section 113(e) of the
Clean Air Act, 42 U.S.C. § 7413(e), EPA has created a formal
policy applicable to situations such as this.  <u>See</u> Hunt Decl. ¶¶
33-34 (<u>citing</u> U.S. EPA, <u>Combined Enforcement Policy for Clean
Air Act Section 112(r)(1), 112(r)(7), and 40 C.F.R. Part 68</u>
(June 2012)).  According to the Hunt Declaration, EPA used that
policy in this case when arriving at its conclusion that the
proposed civil penalty was reasonable and appropriate.  <u>See id.</u>
¶¶ 35-42 (describing the EPA analysis in detail).

        As noted above, the proposed civil penalty of $975,000
is complemented by Bayer's commitment to perform several
specified supplemental environmental projects having an

estimated cost of $ 4,230,819.[2]  EPA has developed a policy
regarding supplemental environmental projects, which specifies
that the agency may "mitigate" a civil penalty by up to 80
percent of the estimated costs of a proposed supplemental
environmental project.  See U.S. EPA, Supplemental Environmental
Projects Policy, at pp. 23-24.  The supplemental environmental
projects contained in the consent decree appear to be consistent
with the EPA policy.  See Decree § 7; id. ¶ 8; see also Hunt
Decl. ¶¶ 45-50.  The portions of the proposed consent decree
that require Bayer to revise and review standard operating
procedures, which make up the bulk of the injunctive relief in
the consent decree, are likewise authorized by the relevant
statutory law.  See 42 U.S.C. § 7412(r)(7); see also 40 C.F.R. ¶
68.79(a) (regarding self-assessments); 40 C.F.R. § 68.67
(regarding hazard analyses, as required by paragraph 14 of the
proposed consent decree).

        Turning to the public interest, it is apparent that
the proposed consent decree advances and protects it.  As
previously noted, the evidence indicates that the 2008 explosion
was the result of numerous, grave safety deficiencies at the
plant.  See Mannan Report, pp. 16-20; Hunt Decl. ¶ 9.  The

---

2  EPA calculated the total civil penalty as including both the
cash penalty and the cost of the proposed supplemental
environmental projects.  See Hunt Decl., ¶¶ 32-42.

proposed consent decree would minimize the risk of reoccurrence through its extensive reporting, approved self-assessment, and standard operating procedure revision requirements applicable not only at the Institute facility but at other Bayer plants in the United States and any others that are built or purchased by Bayer during the next ten years and until the decree is thereafter terminated.  The civil penalties, in turn, serve to deter similar conduct in the future by Bayer or others similarly situated.  The planned supplemental environmental programs, for their part, serve to improve the health of the local community and environment.  <u>See</u> Decree § VII; Hunt Decl. ¶ 44.

Having taken account of all of the applicable factors, the court FINDS that the United States has fairly, reasonably, and adequately obtained compliance with the law while avoiding the cost, delay, and misdirection of resources that might have occurred during time-consuming civil litigation.  The court further FINDS the proposed accord is neither illegal nor the product of collusion, and that it serves and advances the public interest.

In view of these findings, and inasmuch as no party or person has opposed entry of the consent decree, the court ORDERS as follows:

1.    That the unopposed motion of the United States to enter the proposed consent decree be, and it hereby is, granted;

2.    That the proposed consent decree be, and it hereby is, entered with the court's approval this same date, with the modifications described below;

3.    That the appendices originally submitted be substituted with the amended appendices submitted on April 22, 2016; and

4.    That this action be, and it hereby is, dismissed and stricken from the docket, with the court retaining jurisdiction pursuant to the consent decree and any provision therein contemplating the potential for future action by the court.

The Clerk is requested to transmit copies of the memorandum opinion and order to all counsel of record and to any unrepresented parties.

DATED: August 9, 2016

John T. Copenhaver, Jr.
United States District Judge

16