**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

BAYER CROPSCIENCE LP,

     *Defendant*.

Civ. No. 2:15-cv-13331

<u>**MEMORANDUM IN SUPPORT OF MOTION TO ENTER**</u>
<u>**SECOND MODIFICATION OF CONSENT DECREE**</u>

<u>**TABLE OF CONTENTS**</u>

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ..................................................................................................................... 1

ARGUMENT ........................................................................................................................... 6

    I.     THE SECOND MODIFICATION IS FAIR, ADEQUATE, AND
            REASONABLE ............................................................................................. 10

    II.    THE SECOND MODIFICATION IS NOT ILLEGAL, A PRODUCT OF
            COLLUSION, OR AGAINST THE PUBLIC INTEREST .................................... 12

    III.   PUBLIC COMMENTS HAVE NOT SHOWN THAT THE SECOND
            MODIFICATION IS UNFAIR, INADEQUATE, UNREASONABLE,
            ILLEGAL, THE PRODUCT OF COLLUSION, OR AGAINST THE
            PUBLIC INTEREST ..................................................................................... 13

          A.    Completing the West Sump Expansion Would Not Reduce
                 Pollution in the Kanawha River or Protect Drinking Water ..................... 15

          B.    The Second Modification Does Not Lower the Civil Penalty .................. 16

          C.    The Second Modification Is Not a Windfall for BCS ............................. 17

          D.    The Additional SEPs Proposed During the Public Comment Period
                 May Be Untenable ................................................................................. 17

          E.    Soil Contamination Will Be Addressed Pursuant to the Ongoing
                 RCRA Cleanup ..................................................................................... 18

CONCLUSION ...................................................................................................................... 19

## PRELIMINARY STATEMENT

The United States moves to enter the Second Modification to Consent Decree, which it lodged on August 31, 2017. Notice of the modification was published in the Federal Register on September 12, 2017. The United States received and carefully considered comments from the public, which are attached hereto as Exhibits and discussed within. None of the comments present sufficient justification to conclude that the Second Modification should not be entered by the Court.

## BACKGROUND

The United States' Motion to Enter the Second Modification is being filed simultaneously with Plaintiff's Response in Opposition to Citizen Plaintiffs' Motion to Intervene, filed on November 8, 2017. The circumstances of the two motions overlap significantly. Accordingly, aside from including a brief discussion of the identity of counsel, the following background section essentially duplicates the background section in the United States' opposition to intervention.

On August 28, 2008, a runaway chemical reaction occurred inside a 4,000-gallon steel pressure vessel called the residue treater in the methomyl unit at the Institute Plant, a pesticide manufacturing facility operated by Defendant Bayer CropScience LP ("BCS"). The buildup of heat and pressure caused the vessel to explode violently, spraying and igniting a 2,500-gallon mixture of highly flammable chemicals from the vessel, causing an intense fire that burned for more than four hours. One BCS employee died from blunt force trauma, and another died several weeks later in the burn center. More than 40,000 area residents were sheltered-in-place for more than three hours.

For more than two years prior to lodging the original Consent Decree, the parties engaged in substantive discussions regarding the alleged violations, an appropriate settlement, and the

terms of the Consent Decree. Throughout the pre-filing settlement negotiations, BCS was represented by in-house counsel as well by Eileen Millett and Eric Conn. At the time, Ms. Millett was counsel at Epstein Becker Green in the firm's litigation practice. She is currently a partner at Phillips Nizer, LLP. Among other qualifications, she is on the board of advisors for the American Law Institute Environmental Law Advisory Panel and the New York City Environmental Law Leadership Institute. *See* https://www.phillipsnizer.com/attorneys/ millette_bio.cfm. After entry of the Consent Decree, BCS continued to be represented by in-house counsel and Ms. Millett.

Throughout these proceedings, the United States has been represented by Daniel Smith, Senior Counsel in the U.S. Department of Justice, Environment and Natural Resources Division, Environmental Enforcement Section. Mr. Smith has 15 years of experience representing the United States in environmental enforcement matters, including other matters in this district.

The United States filed a complaint against BCS on September 21, 2015 (ECF No. 3), alleging various violations of the Clean Air Act and simultaneously lodged a proposed Consent Decree (ECF No. 5). The United States published notice of the proposed Consent Decree in the Federal Register, 80 Fed. Reg. 57,873–74 (Sept. 25, 2015), and accepted public comments for 30 days. No comments were received. The United States moved to enter the proposed Consent Decree on November 25, 2015 (ECF No. 7). The Court granted that motion on August 9, 2016 (ECF No. 18).

The Consent Decree resolves the civil claims alleged in the Complaint through September 21, 2015, the date on which the Consent Decree was lodged with the Court, subject to certain reservations. (*See* Consent Decree § XIII). In exchange for this resolution, BCS paid a civil penalty and committed to perform supplemental environmental projects (SEPs) and certain

injunctive relief at the Institute Plant and other facilities that it operates or will operate nationwide.

Under the Consent Decree, in addition to paying a civil penalty of $975,000, Consent Decree ¶ 8, BCS must perform a series of SEPs that, at the time the Consent Decree was originally lodged with the Court, had a total value of about $4.2 million, *id.* § VII. As stated in the EPA's SEP Policy, U.S. EPA, Supplemental Environmental Projects Policy (2015 Update) at 1, *available at* https://www.epa.gov/enforcement/2015-update-1998-us-epa-supplemental-environmental-projects-policy, "[a] primary incentive for a defendant to propose a SEP is the potential mitigation of its civil penalty." EPA's SEP Policy allows for the agency to reduce or "mitigate" a portion of the civil penalty with up to 80% of the estimated cost of the SEP. *Id.* at 23–24. As described in the attached declaration from Mary Hunt, a risk management program coordinator for the EPA, the percentage, known as the penalty mitigation credit, varied from project to project, according to evaluation criteria in the EPA's SEP Policy as applied by the case team. The $3.1 million West Sump Expansion SEP was given a fairly low penalty mitigation credit, while other SEPs that entailed donating emergency equipment to police and fire departments (Appendixes F–M) were given a penalty mitigation credit that was twice as high. Hunt Decl. ¶ 21.

Following entry of the Consent Decree, BCS endeavored to implement the SEPs and encountered several problems, such as the fact that some of the equipment described in Appendixes F–M was no longer needed. Hunt Decl. ¶ 24. BCS addressed those problems by proposing modifications to the SEPs. The modifications substituted different kinds of equipment to be purchased by BCS and made other changes that did not alter the character of the SEPs. The cost of some SEPs decreased while the cost of other SEPs increased, with the net result that the

collective cost of the SEPs reached about $4.4 million. *Id.* The Parties agreed to these changes and the United States filed them as a non-material modification of the Consent Decree on March 20, 2017 (ECF No. 21).

Around the same time that the parties were finalizing the non-material modification, BCS provided notice to the EPA of challenges it encountered in designing and implementing the West Sump Expansion SEP. *Id.* ¶ 26. As described in the attached declaration from Connie Stewart, a BCS employee who is the site head of the Institute Plant, the West Sump collects and transfers storm water and waste water associated with industrial activities on the west side of the Institute Plant. Stewart Decl. ¶ 8. The West Sump used to overflow regularly to the Kanawha River, discharging wastewater before it reached the wastewater treatment plant at the facility. The West Sump Expansion aimed to reduce or eliminate those overflows by expanding the capacity of the sump and allowing more time for the wastewater to be pumped to the treatment plant. At the time the Parties entered into the Consent Decree, the estimated cost of the West Sump Expansion SEP was $3.1 million.

During excavation activities for the West Sump Expansion, BCS discovered "unanticipated subsurface conditions including unmarked underground structures, utilities and industrial impediments." Hunt Decl. ¶ 25. BCS had to redesign the sump expansion multiple times due to its proximity to railroads and live utilities. *Id.* ¶ 26. Also, during excavation, workers encountered significant unforeseen conditions including utilities, pipes, large amounts of concrete and rebar, and contaminants in excavated soils, including benzene, toluene, xylene, and 19 polycyclic aromatic hydrocarbons. *Id.* These conditions presented health and safety risks to the workers on the West Sump Expansion SEP. *Id.*

Union Carbide Corporation owns the Institute site and is performing a corrective action under the Resource Conservation and Recovery Act (RCRA) to address soil contamination at other portions of the Site. *Id.* ¶ 28. On April 5, 2017, Dow Chemical Corp., as corporate parent of the Union Carbide Corporation, notified the West Virginia Department of Environmental Protection and the EPA—the agencies overseeing the RCRA cleanup—of the conditions encountered during the excavation. *Id.*

While BCS was designing and constructing the West Sump Expansion, it was simultaneously implementing improvements to the existing sump. Stewart Decl. ¶ 10. These improvements included adding new pumps, a new programmable control system, a new diesel-powered backup system, additional training, and plugging the sump overflow to the river. *Id.* Prior to these improvements, the West Sump overflowed several times a year, discharging untreated wastewater to the Kanawha River. After making the improvements, the overflows stopped occurring. There have not been any overflows from the West Sump since August 30, 2013, despite some significant rainfall events. *Id.* ¶ 11.

After reviewing the information that BCS provided regarding the construction problems and the elimination of overflows from the West Sump, the EPA agreed that construction of the West Sump Expansion should be halted. Hunt Decl. ¶ 30. BCS has expended at least $2.2 million on the abandoned West Sump Expansion project. Stewart Decl. ¶ 13. It has spent an additional $820,000 on the process improvements to the existing sump that have halted the discharges from the West Sump. *Id.* ¶ 12.

BCS has proposed two SEPs that it proposes to implement in lieu of the West Sump Expansion. *Id.* ¶ 18. They entail purchasing equipment for the Jefferson and Institute Volunteer Fire Departments. BCS has committed to spend about $1.7 million for these SEPs. *Id.* Because

these new SEPs are similar to the equipment purchase SEPs in paragraphs F-M of the original

Consent Decree, they received the same penalty mitigation credit (a percentage of the cost) as

those other equipment purchase SEPs. Hunt Decl. ¶ 33. Because of this higher percentage, if

BCS had proposed the replacement SEPs at the time the Parties were negotiating the original

Consent Decree, they would have generated a slightly higher penalty mitigation amount (in

dollars) than the West Sump Expansion. *Id.* ¶ 35.

The United States lodged the Second Modification of Consent Decree ("Second

Modification") with the Court on August 31, 2017. It published notice of the Second

Modification in the Federal Register on September 12, 2017, 82 Fed. Reg. 19332 (Sept. 12,

2017) and accepted public comments for a period of 30 days. The United States received three

comments, including one from several individuals and non-governmental organizations ("Citizen

Plaintiffs") who have now moved to intervene.

## ARGUMENT

The original Consent Decree states that it may be modified, but only "by a subsequent

written agreement signed by all the Parties" and "[w]here the modification constitutes a material

change to this Decree, it is effective only upon approval by the Court." Consent Decree ¶ 84. The

United States' motion to enter the Second Modification should be evaluated under the same

standard that applies to the review of a new consent decree, except that the Court should limit its

review to the terms of the Second Modification because the Court already approved the original

Consent Decree.

According to the Fourth Circuit, "a consent decree 'has elements of both judgment and

contract,' and is subject to 'judicial approval and oversight' generally not present in other private

settlements." *Szaller v. American Nat. Red Cross*, 293 F.3d 148, 152 (4th Cir. 2002), *quoted in*

Mem. Op. and Order at 6, ECF No. 18 (Aug. 9, 2016). A district court's obligation before

entering a consent decree in the Fourth Circuit is to "satisfy itself that the agreement 'is fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.'" *United States v. North Carolina,* 180 F.3d 574, 581 (4th Cir. 1999) (quoting *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991)). Thus, a court must "examine its terms to ensure that they are fair and not unlawful." *Smyth v. Rivero*, 282 F.3d 268, 280 (4th Cir. 2002).

A district court is generally not entitled to change the terms of a consent decree and cannot, under any circumstances, modify the terms of a consent decree without first notifying the Parties of its intent and providing them with an opportunity to present relevant evidence and argument on the proposed modification. *Colorado*, 937 F.2d at 509–10. Ultimately, a district court must either approve or deny a consent decree as a whole. *Id.* at 509. Further the role of this Court is not to determine "whether the settlement is one which the Court itself might have fashioned, or considers ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990).

The scope of a district court's review of the Consent Decree is limited. While a court "should not blindly accept the terms of a proposed settlement," *North Carolina*, 180 F.3d at 581, and should "eschew any rubber stamp approval in favor of an independent evaluation," *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), the court's inquiry need not be all-encompassing:

> [A] trial court approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy. In fact, it is precisely the desire to avoid a protracted examination of the parties' legal rights that underlies entry of consent decrees.

*Bragg v. Robertson*, 83 F.Supp.2d 713, 717 (S.D. W.Va. 2000) (citations omitted). *Accord*

*United States v. Comunidades Unidas Contra la Contaminacion*, 204 F.3d 275, 281 (1st Cir.

2000); *North Carolina* 180 F.3d at 581; *Grinnell,* 495 F.2d at 462.

Not only should a district court's review of a consent decree be narrow in scope, but it

should also entail a certain degree of deference. As the Supreme Court has stated:

> [S]ound policy would strongly lead us to decline . . . to assess the wisdom of the
> Government's judgment in negotiating and accepting the . . . consent decree, at
> least in the absence of any claim of bad faith or malfeasance on the part of the
> Government in so acting.

*Sam Fox Publ'g Co. v. United States,* 366 U.S. 683, 689 (1961).

There are several reasons for conducting a deferential review of a consent decree lodged

by the United States. One reason is "the general principle that settlements are to be encouraged."

*North Carolina*, 180 F.3d at 581. As the Sixth Circuit explained, settlement agreements, which

would include consent decrees, "[spare] the burdens of trial . . . to the parties, to other litigants

waiting their turn before over-burdened courts, and to the citizens whose taxes support the

latter." *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976). Another reason is

that courts owe deference to an administrative agency acting in its area of expertise:

> Where a government agency charged with protecting the public interest has pulled
> the laboring oar in constructing the proposed settlement, a reviewing court may
> appropriately accord substantial weight to the agency's expertise and public
> interest responsibility.

*Bragg,* 83 F. Supp. 2d at 717. Finally, deference should be granted with regard to the Second

Modification as an official act of the Attorney General,[1] who has "exclusive authority and

plenary power to control the conduct of litigation in which the United States is involved, unless

Congress specially authorizes an agency to proceed without the supervision of the Attorney

---

[1] The Second Modification was approved by Nathaniel Douglas, a Deputy Chief in the
Environmental Enforcement Section of the Justice Department, acting under authority delegated
to him.

General." *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992) (*rev'd in part on other grounds*, 247 F.3d 706 (8th Cir. 2001) (citing 28 U.S.C. § 516; *FTC v. Guignon*, 390 F.2d 323, 324 (8th Cir. 1968)). This authority places considerable discretion in the hands of the Attorney General to decide whether, and on what terms, to enter into a settlement. *Hercules*, 961 F.2d at 798 (citing *Swift & Co. v. United States*, 276 U.S. 311, 331–32 (1928)); *United States v. Assoc. Milk Producers, Inc.*, 534 F.2d 113, 117 (8th Cir. 1976) ("The Attorney General must retain considerable discretion in controlling government litigation and in determining what is in the public interest"); *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C.Cir.1995) ("[T]he district court is not empowered to review the actions or behavior of the Department of Justice; the court is only authorized to review the decree itself.")

In sum, the Court's role in reviewing this Second Modification is limited. If the Second Modification is fair, adequate and reasonable, and not illegal, the product of collusion or against the public interest, it ought to be approved without modification by the Court. *Colorado,* 937 F.2d at 509.

Citizen Plaintiffs argue that the Parties bear the burden of establishing that "a significant change in circumstances warrants revision of the decree." Citizen Pl.'s Mem. at 15 (citing *Rufo v.Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992); *Thompson v. HUD*, 404 F.3d 821, 827 (4th Cir. 2005)). The cases they rely upon, however, entailed different circumstances. In both *Rufo* and *Thompson*, a party to the consent decree invoked the Court's authority to modify a consent decree over the opposing parties' objection. *Rufo*, 502 U.S. at 385; *Thompson,* 404 F.3d at 824. Such unilateral modifications fall under Rule 60(b) of the Federal Rules of Civil Procedure and warrant special caution because of the general rule that a court should accept or reject a consent decree as a whole. *See Colorado*, 937 F.2d at 509–10. Here, in contrast, the

Parties to the Consent Decree jointly seek a modification under the terms of paragraph 84 of the Consent Decree itself, which allow for modification. In any event, *Rufo* further states that "[m]odification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles." *Rufo* 502 U.S. at 384. The West Sump Expansion has proven unworkable as a SEP because of the soil contamination that BCS encountered and because of the elimination of overflows from the West Sump. Moreover, the expansion of the West Sump and the elimination of discharges from the sump are "a significant change in circumstances that warrants revision of the decree." As discussed in more detail in part III below, the Second Modification is suitably tailored to resolve the problems arising from those circumstances because it provides for a more valuable SEP that neither decreases the civil penalty imposed on BCS nor decreases BCS's out-of-pocket expenditure. These are the same reasons that make the Second Modification "fair, adequate, and reasonable."

## I.     THE SECOND MODIFICATION IS FAIR, ADEQUATE, AND REASONABLE

The Fourth Circuit has detailed several factors relevant to considering the fairness and adequacy of a consent decree:

> In considering the fairness and adequacy of a proposed settlement, the court must assess the strength of the plaintiff's case. While this assessment does not require the court to conduct a trial or a rehearsal of the trial, the court must take the necessary steps to ensure that it is able to reach an informed, just and reasoned decision. In particular, the court should consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement.

*North Carolina*, 180 F.3d at 581 (internal quotation marks and citations omitted).  The Fourth Circuit did not address in *North Carolina* what, if any, additional factors a district court must consider in order to determine if a consent decree is reasonable. Other courts, however, have addressed this issue. In *United States v. Telluride Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994),

the District of Colorado determined that there are four factors that are relevant to determining whether a consent decree is reasonable. First and most importantly, a court must consider "whether the consent decree is in the public interest and upholds the objectives of the [relevant statute]." *Id.* A court must also consider whether the consent decree is "technically adequate" to accomplish the goals of the statute, "whether it will sufficiently compensate the public for the costs of remedial measures," and "whether it reflects the relative strength or weakness of the government's case against the environmental offender." *Id.* (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 89–90 (1st Cir. 1990)).

By entering the original Consent Decree, the Court has already determined that the original decree was fair, adequate, and reasonable. Upon entering the Consent Decree, the Court wrote, among other things:

> [T]he record indicates that the United States and counsel for defendant engaged in years of arm's length negotiations and had the opportunity to explore each other's positions at length. … Although the parties were reasonably cooperative throughout, there is no indication in the record that the proposed consent decree is the product of collusion between the Government and Bayer…. The proposed consent decree is a legal one. … Turning to the public interest, it is apparent that the proposed consent decree advances and protects it…. [T]he court FINDS that the United States has fairly, reasonably, and adequately obtained compliance with the law. The court further FINDS the proposed accord is neither illegal nor the product of collusion, and that it serves and advances the public interest.

Mem. Op. & Order, ECF No. 18 (Aug. 9, 2016). Nothing in the Second Modification presents a basis for coming to a different conclusion. The Second Modification simply replaces an infeasible and unnecessary SEP with a project that will have more value for the community. As described in the Background section above, if the new equipment purchase SEPs had been included in the Consent Decree in place of the West Sump Expansion, the Consent Decree would have been slightly more favorable to the United States.

The Second Modification continues to be in the public interest because it imposes a significant penalty on BCS for the alleged violations and thus imposes specific and general deterrence against violations of the Clean Air Act. It also includes the same injunctive relief, which can be expected to reduce the risk of future accidental release from facilities operated by BCS. The Consent Decree requires BCS to improve and standardize its SOPs in a systematic way, which should reduce the number of deviations from SOPs. (Consent Decree App. A.) Similarly, the EPA concluded that BCS failed to conduct adequate internal audits of its own compliance. (Complaint, Count 5.) Under the Consent Decree, BCS will be required to not only comply with regulations regarding audits, it will be required to follow detailed enhanced procedures. (Consent Decree ¶¶ 12–13.)

The Second Modification remains technically adequate because it resolves the violations alleged in the complaint. (Consent Decree ¶ 71.) The Second Modification sufficiently compensates the public and reflects the strengths and weakness of the government's case because it recovers a substantial civil penalty that reflects the seriousness of the violation and that the EPA has determined is consistent with its policies. Hunt Decl. ¶¶ 39–40.

## II.     THE SECOND MODIFICATION IS NOT ILLEGAL, A PRODUCT OF COLLUSION, OR AGAINST THE PUBLIC INTEREST

The Second Modification is lawful because it was entered into pursuant to statutory authority delegated to officials at the U.S. Department of Justice and the EPA. Moreover, public officials of the United States are entitled to a presumption that their actions and decisions are not illegal or a product of collusion. *See United States v. McKinley County*, 941 F. Supp. 1062 (D.N.M. 1996) (citing *United States v. Chemical Found., Inc.*, 272 U.S. 1 (1926)). As with the original Consent Decree, the Parties engaged in arm's length adversarial negotiations regarding the Second Modification. The EPA did not initiate or immediately accept BCS's proposal to halt

the West Sump Expansion project, and the EPA rejected some of BCS's SEP proposals before arriving at projects that complied with the SEP Policy and were adequate as replacements for the West Sump Expansion. Hunt Decl. ¶¶ 25–33. This process should provide the Court with adequate assurance that this settlement is not the result of collusion between the United States and Defendant. More importantly, there has not been any suggestion, despite public notice and comment, that the Consent Decree might be illegal, or the product of collusion.

### III. PUBLIC COMMENTS HAVE NOT SHOWN THAT THE SECOND MODIFICATION IS UNFAIR, INADEQUATE, UNREASONABLE, ILLEGAL, THE PRODUCT OF COLLUSION, OR AGAINST THE PUBLIC INTEREST

The United States received three comments from the public regarding the Second Modification. First, the United States received a comment from a concerned citizen urging the United States to "not allow the settlement… to be cut." Ex. 1 at 1. The citizen alleged that BCS has contaminated water (presumably the Kanawha River) and asserted that BCS should "complete the water treatment plant" in order to ensure safe drinking water. It further asserts that "lowering the amount [BCS has] to pay is slap in the face to the people this tragedy has affected and will continue to affect" and that maintaining the penalty amount would avoid giving the message that "the environment, safe drinking water, and people's lives and health are not important."

The second comment, attached as Exhibit 2, was signed by the director of People Concerned About Chemical Safety, Inc. and by a representative of the Natural Resources Defense Council, Inc. It was also supported by the West Virginia branch of the NAACP, the Ohio Valley Environmental Coalition, the West Virginia River Coalition, and the West Virginia Citizen Action Group. These groups asserted that the Second Modification "does not further the public interest" and is not "suitably tailored to the changed circumstances," within the meaning

of the Fourth Circuit in *Thompson v. HUD*, 404 F.3d 821, 827 (4th Cir. 2005) and *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 391 (1992). They argue that the Second Modification represents a windfall for BCS and "is not a reasonable or equitable modification." They urge the United States to require BCS "to fund a SEP valued, at a minimum, at the amount [BCS] saves by abandoning the wastewater SEP." They propose two alternative projects for consideration as SEPs: (1) a study to determine if there were any health effects from exposure to chemicals that may have been released during the 2008 incident; and (2) the construction of an alternate escape route that could be used by residents of Institute, West Virginia to access the highway in the event of a major chemical release. These commenters have also moved to intervene as plaintiffs.

The third comment came from the widow of Bill Oxley, one of the two workers who died as a result of 2008 explosion. Ms. Oxley submitted to the Justice Department a copy of a letter she wrote to the editor of the Charleston Gazette. She writes that the Second Modification is insulting to the families of the workers who died, to students and faculty at the nearby university, and to residents in the area. She expresses concern about the soil contamination that BCS encountered, and additional concern that it will not be cleaned up. Finally, she directs a portion of her letter to the Court, asking it to conclude that it is unfair to reduce the amount of the settlement.

The 2008 explosion was a terrible tragedy. Any incident that results in the loss of human life demands thorough investigation and, if the law was violated, rigorous enforcement. The United States has demonstrated its commitment to those principles in this case by taking extensive steps in response to the 2008 tragedy. As described in its motion to enter the original Consent Decree, following the 2008 explosion, the U.S. EPA, the Chemical Safety Board, and the Occupational Safety and Health Administration, each investigated the incident and shared

their findings with the West Virginia Department of Environmental Protection, which was independently investigating. After completing its investigation, the EPA spent more than two years negotiating the original Consent Decree. The resulting settlement imposes a significant penalty, provides for nationwide injunctive relief that will take 10 years to fully complete, and includes several SEPs. As described in more detail below, the United States would not, and is not, giving away its hard won bargain. For the reasons discussed below, the public comments do not present a reason why the Second Modification should not be entered.

### A. Completing the West Sump Expansion Would Not Reduce Pollution in the Kanawha River or Protect Drinking Water

The first public comment received by the United States asserted that the West Sump Expansion should be completed in order to reduce pollution and protect drinking water. The United States shares the commenter's goals, but respectfully asserts that continuing with the expansion of the West Sump is not likely to do anything to reduce pollution or protect drinking water. At the time the United States approved the original Consent Decree, it had information that the West Sump overflowed several times per year. BCS indicated that the sump expansion was the most practicable means for eliminating those overflows. The EPA approved the SEP with the expectation of reducing pollution during rain events and firefighting emergencies. BCS's subsequent improvements to the West Sump have eliminated discharges from the sump for more than two years, a time-period that included a 100-year rain event. Stewart Decl. ¶ 11. In light of those improvements, expanding the West Sump would likely have little or no environmental benefit. The Parties have instead proposed to add SEPs that improve emergency preparedness in the community surrounding the Institute Plant at no cost to the goal of pollution prevention.

## B.    The Second Modification Does Not Lower the Civil Penalty

The commenters indicate disapproval of the idea of lowering the amount of money to be paid by BCS. They assert that the deterrent effect of the civil penalty will be decreased under the Second Modification, and their sentiment that the Second Modification is "insulting" or "unfair" appears to follow from this conclusion because decreasing the deterrent effect of the settlement would imply that the 2008 incident was not serious, or that the incident did not warrant the terms of the original Consent Decree. The United States maintains that the allegations in the Complaint are extremely serious and that the original Consent Decree was a fair, adequate, and reasonable settlement that should not be diminished. The Second Modification would not diminish the original settlement because: (1) it does not decrease the amount of the cash penalty that BCS has already paid; (2) it does not change the injunctive relief; (3) it does not alter any SEP other than the West Sump Expansion; (4) the replacement SEP adds to the community's emergency preparedness at no cost to pollution prevention; and (5) as described in the background section above, the replacement SEPs would have generated a higher penalty mitigation amount if they had been proposed at the time the original Consent Decree was negotiated. The replacement SEPs, although they cost less than the West Sump Expansion, would have generated a higher penalty mitigation amount because they would have been treated like the other emergency equipment purchase SEPs in the Consent Decree (Appendixes F–M). As a percentage, the penalty mitigation credit for the equipment purchase SEPs was twice as high as the credit for the West Sump Expansion. Hunt Decl. ¶ 21. Applying this higher mitigation percentage to the cost of the proposed replacement SEPs yields a penalty mitigation amount for the replacement SEPs (in dollars) that "is also slightly higher than the penalty mitigation amount for the West Sump Expansion SEP." Hunt Decl. ¶ 35. For this reason, the Second Modification should be viewed as more favorable to United States than the original Consent Decree.

### C.     The Second Modification Is Not a Windfall for BCS

The second comment characterizes the difference in cost between the West Sump SEP and the proposed equipment purchase SEP as a windfall for BCS that should be spent on other SEPs. Looking only at the face of the Consent Decree, there appears to be a cost saving for BCS. The West Sump Expansion was projected to cost $3.1 million and the equipment purchase would cost $1.7 million, a savings of $1.4 million. This amount, however, is not really a savings for BCS. Due to cost overruns and unexpected complications, BCS actually spent $2.2 million on the West Sump Expansion before abandoning the project. Stewart Decl. ¶ 13. BCS did not receive any credit for money spent designing and excavating for the West Sump Expansion, because those expenditures did not achieve their goals. Because BCS has already spent $2.2 million and must spend $1.7 million more, the Second Modification actually increases BCS's out-of-pocket expenses.

### D.     The Additional SEPs Proposed During the Public Comment Period May Be Untenable

The second commenter proposed using the alleged cost savings from the Second Modification to fund additional SEPs:[2] (1) a public health study; and (2) the construction of an expanded evacuation route. The commenter asserts that the goal of the public health study would be "to assess the potential health impacts from the 2008 explosion." Studying the heath impacts would likely be difficult given that the incident happened more than nine years ago. The costs and benefits of such a project are not known. In addition, the SEP Policy generally does not favor projects that entail "[s]tudies or assessments without a requirement to address the problems identified in the study." SEP Policy at 17.

---

[2] As discussed in the Plaintiff's Response in Opposition to Motion to Intervene at pages 11–12, the Court cannot order BCS to perform these additional SEPs.

The evacuation route SEP would purportedly create a safer evacuation route by "extending the roads and streets leading north" and "opening a passage" to the east. The commenter does not expressly identify which roads should be extended to the north. Many of the roads identified on the map included as the commenter's appendix E are streets in residential neighborhoods or on university property. Changing road configurations in these areas might mean demolishing homes or other buildings, and may not be welcome by the community. As for opening a passage to the east, there are already two: (1) to the north, Route 25 (Fairlawn Ave) allows eastbound traffic, and (2) to the south, Charles Ave. and Dunbar Ave. together allow eastbound traffic (the roads are separated by a train track, but there are two crossings). Constructing an evacuation route could require years of traffic studies, approval by various other government agencies, and may be inconsistent with the EPA's SEP Policy if other federal funds are available. SEP Policy at 9–10.

The commenter asserts that either of the two proposed projects "can be funded by using more than $1 million that [BCS] is saving by substituting a less expensive project for the West Sump project." As discussed above, in fact there are no such cost savings to BCS.

### E. Soil Contamination Will Be Addressed Pursuant to the Ongoing RCRA Cleanup

The third commenter expressed concern that the soil contamination encountered by BCS would be ignored and not cleaned up. Even prior to BCS encountering the soil contamination, the Institute Plant was the subject of corrective action under the Resource Conservation and Recovery Act ("RCRA"). Union Carbide Corporation, as the owner of the Institute Plant, is responsible for implementing the RCRA Corrective Action. The soil contamination encountered by BCS has been reported to the officials at the EPA and the West Virginia Department of Environmental Protection who oversee the corrective action. Hunt Decl. ¶ 28.

## CONCLUSION

The proposed equipment purchase SEPs are fair, adequate, and reasonable because they maintain the applicable civil penalty, benefit the same community, and have a closer nexus to the violations than the West Sump Expansion. For the reasons stated herein, the United States respectfully requests that the Court sign and enter the Second Modification.

Respectfully Submitted,

JEFFERY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

December 6, 2017                          /s/ Daniel S. Smith
Dated                                    DANIEL S. SMITH
                                         Senior Counsel
                                         Environmental Enforcement Section
                                         Environment and Natural Resources Division
                                         U.S. Department of Justice
                                         P.O. Box 7611, Ben Franklin Station
                                         Washington, D.C. 20044
                                         601 D Street NW
                                         Washington, DC 20004
                                         202-305-0371 (voice)
                                         202-514-0097 (fax)
                                         dan.smith2@usdoj.gov

                                         CAROL A. CASTO
                                         U.S. Attorney
                                         U.S. Attorney's Office, Southern District of
                                         West Virginia

                                         /s/ Gary L. Call
                                         GARY L. CALL
                                         Assistant United States Attorney
                                         WV State Bar No. 589
                                         U.S. Attorney's Office,
                                          Southern District of West Virginia
                                         P.O. Box 1713
                                         Charleston, WV 25301
                                         (304) 345-2200 (voice)
                                         (304) 347-5440 (fax)
                                         gary.call@usdoj.gov