# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>BAYER CROPSCIENCE LP<br><br>*Defendant*. | Civ. No. 2:15-cv-13331 |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO INTERVENE**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 6

    I.     Citizen Plaintiffs Lack Standing To Oppose Modification of the Consent Decree ...................................................................................................................7

         A.     Citizen Plaintiffs Have No Injury in Fact That Is Traceable to the Second Modification ................................................................................7

         B.     Citizen Plaintiffs' Alleged Injuries Would Not Be Redressed by Denying the United States' Motion To Modify the Consent Decree...........9

    II.    If Citizen Plaintiffs Have Standing, the Scope of Their Intervention Should Be Limited ........................................................................................13

    III.   Amicus Status Given Citizen Plaintiffs More Than Ample Voice, but A Hearing Is Unnecessary ......................................................................................15

CONCLUSION................................................................................................................... 16

## PRELIMINARY STATEMENT

The United States opposes Citizen Plaintiffs' motion to intervene because they lack standing. Citizen Plaintiffs bear the burden of proof of establishing standing, and they have failed to establish an injury in fact that is traceable to the proposed Second Modification of Consent Decree. In addition, none of their alleged injuries are redressable by the Court. If Citizen Plaintiffs are permitted to intervene, their intervention should be limited to submitting materials in support of, or in opposition to, the Second Modification. The United States does not oppose Citizen Plaintiffs' alternative request that the Court consider their brief as an amicus submission in opposition to Second Modification. However, regardless of the posture of Citizen Plaintiffs, the United States opposes their request for a hearing on the grounds that the issue is clear on the written submissions.

## BACKGROUND

The United States' Motion to Enter the Second Modification is being filed simultaneously with Plaintiff's Response in Opposition to Citizen Plaintiffs' Motion to Intervene, filed on November 8, 2017. The circumstances of the two motions overlap significantly. Accordingly, the following background section essentially duplicates the background section in the United States' Motion to Enter the Second Modification.

On August 28, 2008, a runaway chemical reaction occurred inside a 4,000-gallon steel pressure vessel called the residue treater in the methomyl unit at the Institute Plant, a pesticide manufacturing facility operated by Defendant Bayer CropScience LP (BCS). The buildup of heat and pressure caused the vessel to explode violently, spraying and igniting a 2,500-gallon mixture of highly flammable chemicals from the vessel, causing an intense fire that burned for more than four hours. One BCS employee died from blunt force trauma, and another died several weeks

1

later in the burn center. More than 40,000 area residents were sheltered-in-place for more than three hours.

The United States filed a complaint against BCS on September 21, 2015 (ECF No. 3), alleging various violations of the Clean Air Act and simultaneously lodged a proposed Consent Decree (ECF No. 5). The United States published notice of the proposed Consent Decree in the Federal Register, 80 Fed. Reg. 57,873–74 (Sept. 25, 2015), and accepted public comments for 30 days. No comments were received. The United States moved to enter the proposed Consent Decree on November 25, 2015 (ECF No. 7). The Court granted that motion on August 9, 2016 (ECF No. 18).

The Consent Decree resolves the civil claims alleged in the Complaint through September 21, 2015, the date on which the Consent Decree was lodged with the Court, subject to certain reservations. (*See* Consent Decree § XIII). In exchange for this resolution, BCS paid a civil penalty and committed to perform supplemental environmental projects (SEPs) and certain injunctive relief at the Institute Plant and other facilities that it operates or will operate nationwide.

Under the Consent Decree, in addition to paying a civil penalty of $975,000, Consent Decree ¶ 8, BCS must perform a series of SEPs that, at the time the Consent Decree was originally lodged with the Court, had a total value of about $4.2 million, *id.* § VII. As stated in EPA's SEP Policy, U.S. EPA, Supplemental Environmental Projects Policy (2015 Update) at 1, *available at* https://www.epa.gov/enforcement/2015-update-1998-us-epa-supplemental-environmental-projects-policy, "[a] primary incentive for a defendant to propose a SEP is the potential mitigation of its civil penalty." EPA's SEP Policy allows for the agency to reduce or "mitigate" a portion of the civil penalty with up to 80% of the estimated cost of the SEP. *Id.* at

23–24. As described in the attached declaration from Mary Hunt, a risk management program coordinator for the EPA, the percentage, known as the penalty mitigation credit, varied from project to project, according to evaluation criteria in the EPA's SEP Policy as applied by the case team. The $3.1 million West Sump Expansion SEP was given a fairly low penalty mitigation credit, while other SEPs that entailed donating emergency equipment to police and fire departments (Appendixes F–M) were given a penalty mitigation credit that was twice as high. Hunt Decl. ¶ 21.

Following entry of the Consent Decree, BCS endeavored to implement the SEPs and encountered several problems, such as the fact that some of the equipment described in Appendixes F–M was no longer needed. Hunt Decl. ¶ 24. BCS addressed those problems by proposing modifications to the SEPs. The modifications substituted different kinds of equipment to be purchased by BCS and made other changes that did not alter the character of the SEPs. The cost of some SEPs decreased while the cost of other SEPs increased, with the net result that the collective cost of the SEPs reached about $4.4 million. *Id.* The Parties agreed to these changes and the United States filed them as a non-material modification of the Consent Decree on March 20, 2017 (ECF No. 21).

Around the same time that the parties were finalizing the non-material modification, BCS provided notice to the EPA of challenges it encountered in designing and implementing the West Sump Expansion SEP. *Id.* ¶ 26. As described in the attached declaration from Connie Stewart, a BCS employee who is the site head of the Institute Plant, the West Sump collects and transfers storm water and waste water associated with industrial activities on the west side of the Institute Plant. Stewart Decl. ¶ 8. The West Sump used to overflow regularly to the Kanawha River, discharging wastewater before it reached the wastewater treatment plant at the facility. The West

Sump Expansion aimed to reduce or eliminate those overflows by expanding the capacity of the sump and allowing more time for the wastewater to be pumped to the treatment plant. At the time the Parties entered into the Consent Decree, the estimated cost of the West Sump Expansion SEP was $3.1 million.

During excavation activities for the West Sump Expansion, BCS discovered "unanticipated subsurface conditions including unmarked underground structures, utilities and industrial impediments." Hunt Decl. ¶ 25. BCS had to redesign the sump expansion multiple times due to its proximity to railroads and live utilities. *Id.* ¶ 26. Also, during excavation, workers encountered significant unforeseen conditions including utilities, pipes, large amounts of concrete and rebar, and contaminants in excavated soils, including benzene, toluene, xylene, and 19 polycyclic aromatic hydrocarbons. *Id.* These conditions presented health and safety risks to the workers on the West Sump Expansion SEP. *Id.*

Union Carbide Corporation owns the Institute site and is performing a corrective action under the Resource Conservation and Recovery Act (RCRA) to address soil contamination at other portions of the Site. *Id.* ¶ 28. On April 5, 2017, Dow Chemical Corp., as corporate parent of the Union Carbide Corporation, notified the West Virginia Department of Environmental Protection and the EPA—the agencies overseeing the RCRA cleanup—of the conditions encountered during the excavation. *Id.*

While BCS was designing and constructing the West Sump Expansion, it was simultaneously implementing improvements to the existing sump. Stewart Decl. ¶ 10. These improvements included adding new pumps, a new programmable control system, a new diesel-powered backup system, additional training, and plugging the sump overflow to the river. *Id.* Prior to these improvements, the West Sump overflowed several times a year, discharging

untreated wastewater to the Kanawha River. After making the improvements, the overflows stopped occurring. There have not been any overflows from the West Sump since August 30, 2013, despite some significant rainfall events. *Id.* ¶ 11.

After reviewing the information that BCS provided regarding the construction problems and the elimination of overflows from the West Sump, the EPA agreed that construction of the West Sump Expansion should be halted. Hunt Decl. ¶ 30. BCS has expended at least $2.2 million on the abandoned West Sump Expansion project. Stewart Decl. ¶ 13. It has spent an additional $820,000 on the process improvements to the existing sump that have halted the discharges from the West Sump. *Id.* ¶ 12.

BCS has proposed two SEPs that it proposes to implement in lieu of the West Sump Expansion. *Id.* ¶ 18. They entail purchasing equipment for the Jefferson and Institute Volunteer Fire Departments. BCS has committed to spend about $1.7 million for these SEPs. *Id.* Because these new SEPs are similar to the equipment purchase SEPs in paragraphs F-M of the original Consent Decree, they received the same penalty mitigation credit (a percentage of the cost) as those other equipment purchase SEPs. Hunt Decl. ¶ 33. Because of this higher percentage, if BCS had proposed the replacement SEPs at the time the Parties were negotiating the original Consent Decree, they would have generated a slightly higher penalty mitigation amount (in dollars) than the West Sump Expansion.

Although BCS appears to save $1.4 million as a result of the Second Modification—the difference between the $3.1 million cost of the West Sump Expansion and the $1.7 million cost of the replacement SEPs—the Second Modification actually increases BCS's out-of-pocket costs by $0.8 million because BCS has spent $2.2 million on the West Sump Expansion. Stewart Decl.

5

¶ 13. The does not include the additional $0.8 million that it spent on process improvements to the existing sump.

The United States lodged the Second Modification of Consent Decree ("Second Modification") with the Court on August 31, 2017. It published notice of the Second Modification in the Federal Register on September 12, 2017. 82 Fed. Reg. 19332 (Sept. 12, 2017) and accepted public comments for a period of 30 days. The United States received three comments, described in the accompanying Motion to Enter the Second Modification, including one from several individuals and non-governmental organizations ("Citizen Plaintiffs").

Citizen Plaintiffs first raised the idea on intervention by email on November 3, 2017. They filed their motion five days later.

## ARGUMENT

Citizen Plaintiffs have a statutory right to intervene pursuant to section 304 of the Clean Air Act, 42 U.S.C. § 7604(a)(1), but they must nonetheless have standing. In *Town of Chester v. Laroe Estates*, 137 S.Ct. 1645 (June 5, 2017), the Supreme Court held that if an intervenor of right "wishes to pursue relief not requested by a plaintiff," then it "must meet the [standing] requirements of Article III" of the Constitution. *Chester*, 137 S.Ct. at 1648. This holding elaborated on an earlier holding that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* at 1650 (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)). In essence, the Court held that its earlier holding in *Davis* applies equally to intervenors as it does to plaintiffs. The Court wrote "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." *Id.* at 1651.

Citizen Plaintiffs concede that by opposing the Second Modification, they are seeking "different relief than that sought by the Government." Citizen Pls.' Mem. Supp. Mot. to

Intervene ("Citizen Pls.' Mem.") at 6, n.5. Therefore, at least one Citizen Plaintiff must have standing to oppose the Second Modification.

Citizen Plaintiffs bear the burden of proof. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In order to establish that they have standing, Citizen Plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Chester*, 137 S.Ct. at 1650 (quoting *Davis*, 554 U.S. at 734). As discussed below, Citizen Plaintiffs fail to establish standing because they lack traceable injuries in fact and because the only relief available to them—denial of the the United States' motion to enter the Second Modification of Consent Decree—will not redress their injuries.

I. **Citizen Plaintiffs Lack Standing To Oppose Modification of the Consent Decree**

A. **Citizen Plaintiffs Have No Injury in Fact That Is Traceable to the Second Modification**

In order to sustain intervention, the intervenor's injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotations omitted). In addition, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 561.

Citizen Plaintiffs' precise injury is difficult to ascertain from their brief. They appear to allege four injuries, two of which pertain to the 2008 explosion underlying the complaint: (1) that the 2008 explosion injured their health or their family members; (Citizen Pls.' Mem. at 6) and

7

(2) that the 2008 explosion caused them fear and increased their risk of harm (id. at 7). The other two alleged injuries pertain to the Second Modification. Citizen Plaintiffs allege: (3) that the Second Modification will increase the likelihood of future violations of the Clean Air Act, putting them at additional risk; and (4) that the reduction in SEP spending in their community would harm them.

The first two alleged injuries fail to support Citizen Plaintiffs' claim of standing because they are not traceable to the action they challenge: the Second Modification. As the Supreme Court explained in *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83 (1998), "there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co.* 523 U.S. at 103. Citizen Plaintiffs' first two alleged injuries might be traceable to the violations alleged in the Complaint, and thus might have been relevant to standing to intervene in the original action. *See United States v. Arch Coal*, Civ. No. 2:11-0133, 2011 WL 2493072, at *10 (S.D. W.Va. June 22, 2011) (Copenhaver, J.) (allowing intervention before entry of a consent decree where a citizen plaintiff showed injuries in fact, traceable to ongoing violations of the Clean Water Act). But those violations in the complaint are not ongoing, and neither the Parties nor Citizen Plaintiffs have proposed modifying the injunctive relief designed to correct those violations and prevent their recurrence. Citizen Plaintiffs must show injuries that are traceable to the Second Modification.[1]

The third alleged injury, that the Second Modification will increase the risk of violations of the Clean Air Act, is simply not an injury in fact. As discussed above, under *Lujan*, an injury

---

[1] Under *Town of Chester*, a party must have standing for each form of relief it seeks. Citizen Plaintiffs seek to avoid a modification of the consent decree that diminishes the amount of money that BCS will spend on SEPs. Therefore their injury must arise from modification of the SEPs.

8

must not be "conjectural or hypothetical" *Lujan,* 504 U.S. at 560. Citizen Plaintiffs' third alleged injury asks the Court to assume that lowering the amount of money that BCS spends directly on SEPs will diminish the general deterrent effect of the Consent Decree, and that *might* cause some unidentified party to decide to violate the Clean Air Act at some *indefinite time* in the future, *possibly* causing harm to Citizen Plaintiffs. This is the epitome of a conjectural or hypothetical injury.[2]

The fourth and final alleged injury, reduced SEP spending in the community, is not an injury in fact because it is not concrete and particularized. While the community might yield some indirect economic benefit from millions of dollars spent on a construction project at the Institute Plant like the West Sump Expansion, the Citizen Plaintiffs do not make any meaningful allegation that they will suffer any harm if BCS spends no more than the $2.2 million it has already spent on the West Sump Expansion, Stewart Decl. ¶ 13, and purchases $1.7 million worth of equipment for volunteer fire departments as described in the Second Modification (for a total of $3.9 million or approximately $0.8 million *more* than it originally planned to spend on the West Sump Expansion).

      **B.**      **Citizen Plaintiffs' Alleged Injuries Would Not Be Redressed by Denying the United States' Motion To Modify the Consent Decree**

Even if Citizen Plaintiffs' alleged injuries were "injuries in fact" and met the traceability requirement, denying the United States' motion to enter the Second Modification would not redress those injuries. In fact, Citizen Plaintiffs' alleged injuries are not redressable at all because

---

[2] In addition to being conjectural, Citizen Plaintiffs' argument is incorrect. As discussed in the background section of this memorandum, the SEPs in the Second Modification will result *higher* out of pocket expenditures by BCS. The Second Modification will deter violations of the Clean Air Act adequately and to a greater extent than the existing Consent Decree.

9

BCS is no longer in violation of the Clean Air Act. In *Steel Company*, a citizens' group brought suit against a manufacturing company alleging that it failed to file mandatory reports with the EPA for ten years. *Steel Co.*, 523 U.S. at 86–87. The company, which had received notice of the suit, submitted the reports before the complaint was filed. *Id.* at 88. The Supreme Court held that because the company was now in compliance, the citizens' request for injunctive relief could not redress any injury they suffered, but must instead serve to deter future violations, an interest that the Court found insufficient to support standing. *Id.* at 108–09. Similarly, the Court held that the citizens' demand for civil penalties for the violations would not remediate their own injury, but would instead vindicate an "'undifferentiated public interest' in faithful execution" of the law. *Id* at 106 (quoting *Lujan*, 504 U.S. at 577). The majority opinion specifically rejected the idea that punishment and deterrence redressed a cognizable injury for a citizens' group. *Id.* at 106–07. Here, because of the close relationship between SEPs and civil penalties,[3] increasing the cost of the SEPs in the Second Modification might have an effect similar to increasing the civil penalty imposed on BCS, but that would, at most, achieve generalized deterrence. As the Court wrote, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court, that is the very essence of the redressability requirement." *Id.* at 107.

After the *Steel Company* decision, the Supreme Court addressed citizen standing to seek civil penalties in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 188 (2000). In that case, the Court clarified that a citizen can seek civil penalties for harm that is ongoing at the time of the violation, but it did so by distinguishing *Steel Company* rather than overturning it. In the text of the *Laidlaw* decision it wrote, "*Steel Co.* held that private

---

[3] A defendant that does not perform a SEP will generally pay a higher civil penalty than if the defendant does perform a SEP.

plaintiffs, unlike the Federal Government, may not sue to assess penalties for wholly past violations." *Id.* at 188. That rule remains good law. Citizen Plaintiffs cite *Laidlaw*, but fail to allege that any of the violations in the complaint are ongoing. Notably, another case they rely upon, *Arch Coal*, 2011 WL 2493072, also entailed ongoing violations. In *Arch Coal*, this Court held that a citizen's group had standing to be heard on "the suitability of the proposed civil penalty as it relates to the selenium violations, and (2) the putatively superior selenium treatment protocols." *Id.* at *10. However those selenium discharges were ongoing. *Id.* at *4. The fact pattern of *Arch Coal* matches that of *Laidlaw*, while the facts in this case are more similar to *Steel Co.*, in which the Supreme Court found that citizens did not have standing.

Neither the Parties, nor Citizen Plaintiffs, are proposing to modify the injunctive relief in the Consent Decree calculated at securing future compliance with the law. Instead, Citizen Plaintiffs urge the Court not to enter the Second Modification because the total cost of the SEPs under the Second Modification is less than the total cost of the SEPs that BCS is currently required to perform. In addition to the equipment purchase SEP that the Parties have negotiated,[4] Citizen Plaintiffs "urge the Court to require the parties to adopt additional SEPs." Citizen Pls.' Mem. at 14. Citizen Plaintiffs do not challenge the injunctive relief or any other provision of the Consent Decree.

As Citizen Plaintiffs seems to acknowledge in their proposed Complaint in Intervention,[5] the Court cannot order BCS to perform additional SEPs. There are at least two reasons why.

---

[4] Citizen Plaintiffs write, "the purchase of equipment for emergency responders is a worthwhile project." Citizen Pls.' Mem. at 14.

[5] Citizen Plaintiffs' proposed Complaint in Intervention (ECF No. 28-6) requests that the court "[d]eny the proposed Second Modification of Consent Decree" and to allow public comment "in the event and the Parties explore potential alternative or additional [SEPs]," but does not request that the Court order BCS to perform additional SEPs. Proposed Complaint in Intervention at 5.

First, SEPs are projects that a settling defendant could not be legally required to perform but for their voluntary agreement to undertake them in settlement of an enforcement action. SEP Policy at 1 ("Where a proposed project could reasonably comprise part of the injunctive relief portion of a settlement, it should not be a SEP.") Second, the review of a proposed consent decree, or here, a modification of a consent decree, is an up-or-down affair. As the Tenth Circuit wrote in *United States v. State of Colorado*, 937 F.2d 505 (10th Cir. 1991) that "[w]hile the court may either approve or deny the issuance of a consent decree, generally it is not entitled to change the terms of the agreement stipulated to by the parties." *Colorado*, 937 F.2d at 509 (citing *Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985)). This holding should apply equally to a negotiated consent decree modification because both represent a carefully crafted balance of the parties' interests. In either case, "the settlement must stand or fall as a whole." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982), *quoted in Colorado*, 937 F.2d at 509. Citizen Plaintiffs appear to acknowledge this limitation in their proposed complaint in intervention (ECF No. 28-6).

The Court's other option is to deny the United States' motion to enter the Second Modification. The Court should not deny the motion merely because it believes that the United States could have imposed higher SEP costs on BCS; courts should not "participate in bargaining for better terms." *Plummer v. Chemical Bank,* 668 F.2d 654, 655 n.1 (2d Cir.1982). If the Second Modification is disapproved, the United States and BCS will be left with the original unmodified Consent Decree, directing BCS to construct an unneeded and infeasible wastewater sump. It would be up to the United States and BCS to decide whether to negotiate some other modification of the Consent Decree or to seek other relief at that point. In any event, denying entry of the Second Modification will not redress any injuries of Citizen Plaintiffs.

## II. If Citizen Plaintiffs Have Standing, the Scope of Their Intervention Should Be Limited

If intervention is granted, the Court should limit the scope of Citizen Plaintiffs' intervention to opposing the Second Modification because such limitation would allow Citizen Plaintiffs to assert their interests in this case while ensuring that the matter is resolved in a fair, timely, and efficient manner by keeping primary enforcement authority with the original government Plaintiff. Limiting the scope of Citizen Plaintiffs' intervention will allow the United States to continue to carry out its responsibility as primary enforcer of the Clean Air Act. And even though they cannot expand the scope of the litigation, as limited intervenors Citizen Plaintiffs would be able to submit a brief to fully argue their position that the Second Modification is not fair, adequate, and reasonable, or is illegal, a product of collusion, or against the public interest.

Although Rule 24 may give a party a right to intervene, a court still may impose reasonable restrictions in order to ensure the efficient adjudication of the case. *United States v. Duke Energy Corp.*, 171 F.Supp.2d 560, 565 (M.D.N.C. 2001) (citing Fed. R. Civ. P. 24 advisory committee notes to 1966 amendments). "'An intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceedings.'" *United States v. DeKalb Cnty., Ga.*, Case No. 1:10-cv-4039-WSD, 2011 WL 6369569, at *9 (N.D. Ga. Oct. 11, 2011) (*quoting Vinson v. Wash. Gas Light Co.*, 321 U.S. 489, 498 (1944)); *accord Local No. 93, Int'l Ass'n of Firefighters v. Cleveland*, 478 U.S. 501, 529 (1986) (holding that an intervenor cannot block a court's decree simply by withholding its consent) (citations omitted); *Duke Energy Corp.*, 171 F.Supp.2d at 565 (finding that party's unconditional right to intervene does not bar a court from ensuring efficiency by imposing reasonable limitations on the scope of the intervention) (citing

*Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 383 (1987) (Brennan, J., concurring)).

Rule 24 does not allow private parties, even intervenors as of right, the ability to "hijack" proceedings where the government is diligently engaged in enforcing the law. *United States v. Lexington-Fayette Urban Cnty. Gov't*, Case No. 06-386-KSF, 2007 WL 2020246, at *4 (E.D. Ky. July 6, 2007). Here, the proceedings are to determine whether the Second Modification "is fair, adequate, and reasonable" and "not illegal, a product of collusion, or against the public interest." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999). Citizen Plaintiffs' intervention, if allowed, should be limited to those issues.

The states and federal government are the primary enforcers of the Clean Air Act, and courts have held that citizen suits and citizen intervention supplement, not supplant, federal and state enforcement. *See Gwaltney of Smithfield, Inc. v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987) (finding that Congress intended for the Government to bear primary enforcement responsibility and citizen suits play a supplementary role under a parallel scheme under the Clean Water Act) Thus, while an intervening party has certain rights, it cannot carry on as if it were bringing a separate suit. *United States v. Metro. Water Reclamation Dist. of Greater Chicago*, 792 F.3d 821, 825 (7th Cir. 2015). This is even more true here, where a consent decree has already been entered, and the violations are not ongoing.

Citizen Plaintiffs seem to concede that the scope of their intervention should be limited. In their motion to intervene (ECF No. 28), they request to intervene "for the purpose of opposing any reduction in the financial obligations of Bayer CropScience, LP under the Consent Decree entered previously in this proceeding," and "for the additional purpose of proposing

Supplemental Environmental Projects (SEPs) to utilize funds Bayer CropScience, LP agreed to expend under the original Consent Decree." Mot. Interv. at 1.

### III. Amicus Status Gives Citizen Plaintiffs More Than Ample Voice, and a Hearing Is Unnecessary

The United States agrees with Citizen Plaintiffs that the Court has broad discretion to allow the participation of amici. Regardless of whether Citizen Plaintiffs are permitted to intervene, the comments and concerns in their public comments, motion to intervene, and supporting materials have been heard and considered by the United States prior to its decision to move to enter the Second Modification. They are being submitted to the Court along with the United States' motion to enter the Second Amendment to the Consent Decree and thus will be heard and considered again by the Court in ruling on the United States' motion. Accepting these comments as an amicus submission is an appropriate means of ensuring that Citizen Plaintiffs' views are adequately represented.

The United States opposes Citizen Plaintiffs' demand for a hearing to assess the fairness of the Second Modification. As explained in more detail in the accompanying motion to enter the Second Modification: (1) the Second Modification does not decrease the amount of the cash penalty that BCS has already paid; (2) it does not change the injunctive relief; (3) it does not alter any SEP other than the West Sump Expansion; (4) the replacement SEP adds to the community's emergency preparedness at no cost to pollution prevention; and (5) the replacement SEPs would have generated a higher penalty mitigation amount if they had been proposed at the time the original Consent Decree. Citizen Plaintiffs' concerns about the Second Modification ring hollow. Because the Court has already determined that the Consent Decree is fair, adequate, and reasonable, it can readily conclude from the written submissions, without the need for a hearing, that the Second Modification is also fair, adequate, and reasonable.

# **CONCLUSION**

For the reasons stated herein, the United States respectfully requests that the Court deny Citizen Plaintiffs' motion to intervene, accept Citizen Plaintiffs' papers as an amicus submission at the Court's discretion, and deny Citizen Plaintiffs' request for a hearing.

Respectfully Submitted,

JEFFERY WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

December 6, 2017
Dated

/s/ Daniel S. Smith
DANIEL S. SMITH
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
601 D Street NW
Washington, DC 20004
202-305-0371 (voice)
202-514-0097 (fax)
dan.smith2@usdoj.gov

CAROL A. CASTO
U.S. Attorney
U.S. Attorney's Office, Southern District of West Virginia

/s/ Gary L. Call
GARY L. CALL
Assistant United States Attorney
WV State Bar No. 589
U.S. Attorney's Office,
 Southern District of West Virginia
P.O. Box 1713
Charleston, WV 25301
(304) 345-2200 (voice)
(304) 347-5440 (fax)
gary.call@usdoj.gov

**CERTIFICATE OF SERVICE**

On December 6, 2017, I electronically submitted the foregoing motion to enter and accompanying memorandum and declarations with the clerk of court for the U.S. District Court, Southern District of West Virginia, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

/s/ Daniel S. Smith
Daniel S. Smith