## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### AT CHARLESTON

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                         Civil Action No. 15-13331

BAYER CROPSCIENCE LP,

      Defendant.

### DEFENDANT BAYER CROPSCIENCE LP'S MEMORANDUM SUPPORTING ENTRY OF SECOND MODIFICATION OF CONSENT DECREE

On December 6, 2017, the United States filed its Motion to Enter Second Modification of Consent Decree (ECF No. 35). Defendant Bayer CropScience LP ("Defendant" or "BCS") hereby submits its memorandum in support of the government's motion and entry of the Second Modification of the Consent Decree (ECF No. 25-1).

## I.    INTRODUCTION

The proposed Second Modification of the Consent Decree ("Second Modification"), which is limited to substituting two alternative Supplemental Environmental Projects ("SEPs") for the partially-completed West Sump Expansion SEP, is fair, reasonable, and adequate, and should be approved by this Court because:

1. The amount of the civil penalty BCS has paid under the Consent Decree remains $975,000;

2. The nationwide injunctive relief BCS must perform under the Consent Decree is unchanged;

3. The 13 other SEPs BCS must complete as part of the Consent Decree are unchanged, with the exception of a previously-entered non-material modification that *increased* costs;

4. BCS's total out-of-pocket costs will increase under the Second Modification as compared to the Consent Decree, preserving the same or even a greater level of deterrence;

5. The U.S. Environmental Protection Agency ("EPA" or "the agency") has determined that the new SEPs offer greater environmental and public health benefits than the West Sump Expansion SEP and would therefore offset more of the civil penalty than the West Sump Expansion SEP notwithstanding their lower estimated cost; and

6. Completing the West Sump Expansion SEP would offer little or no environmental benefit in the form of reduced overflows from the West Sump into the Kanawha River, because other mitigation efforts undertaken by BCS have successfully prevented overflows since their completion in August 2013.

There is no serious dispute that BCS has run up against unexpected challenges that render the completion of the West Sump Expansion SEP impracticable. During excavation of the West Sump, BCS encountered buried debris and soil impacts that posed a health and safety risk to construction workers.[1] The debris and soil impacts were significant enough that BCS's attempts to redesign or relocate elements of the exaction to avoid affected areas were not successful. Completion of the West Sump Expansion SEP, even if it were possible, would prove

---

[1] The soil impacts have been duly reported to EPA and the West Virginia Department of Environmental Protection by the current owner of the Institute industrial park, where the West Sump is located. Declaration of Mary A. Hunt in Support of the United States' Mot. to Enter the Second Modification to Consent Decree ("Hunt Decl.") ¶ 28 (ECF No. 35-4).

significantly costlier than initial estimates.  Before halting construction in 2017, BCS spent more than $2.2 million on the project.

Further, the purpose of the West Sump Expansion SEP—to reduce overflows of untreated water from the West Sump into the Kanawha River—has otherwise been accomplished through the installation of new pumps and controls and increasing personnel to the area at a cost to BCS of over $800,000.  As a result of those efforts, there has not been an overflow event since August 2013.

Because the Court previously approved and entered the original Consent Decree, and the only change proposed by the Second Modification is to substitute two new SEPs for the West Sump Expansion SEP, there is only one question before the Court: whether the new projects are a fair, reasonable, and adequate replacement for the West Sump Expansion SEP.  The government avers that they are, and BCS agrees.

SEPs are environmentally beneficial projects or activities that are not required by law, but that a defendant in an enforcement action agrees to undertake as a means to reduce its civil penalty.[2]  The reduction is not dollar-for-dollar.  Rather, the amount of the penalty is reduced by a percentage—called the "mitigation percentage"—of the estimated cost to implement the project.  EPA alone assigns the mitigation percentage allowed for each project based on its consideration of a number of factors outlined in the agency's *SEP Policy*, including the significance and quantity of the benefits of the project to public health and/or the environment, how well the project reduces risk to a community that may have been disproportionately exposed

---

[2] To qualify as a SEP, the project must have a sufficient nexus to the violation, by demonstrating that it is designed to reduce the likelihood that similar violations will occur in the future, reduce the adverse impact to public health and/or the environment to which the violation at issue contributes, or reduce the overall risk to public health and/or the environment potentially affected by the violation at issue.  EPA SEP Policy (2015 Update) at 8, *available at* https://www.epa.gov/sites/production/files/2015-04/documents/sepupdatedpolicy15.pdf (the "*SEP Policy*"). According to EPA's *SEP Policy*, "nexus" is easier to establish if the primary impact of the project is at the site where the alleged violation occurred, or nearby.  *Id.*

3

to pollution, and whether the project was developed by taking into consideration input from the affected community.

Based upon its consideration of these and other factors set forth in its policy, EPA assigned a mitigation percentage to the West Sump Expansion SEP that was "much lower" than the percentage assigned to the other SEPs included in the Consent Decree.  Hunt Decl. ¶ 22.  For example, EPA assigned the original group of SEPs for the purchase of emergency equipment for first responders a mitigation percentage that was "twice as high" as that for the West Sump Expansion SEP.  *Id.* ¶ 21.  After considering and rejecting "many" of BCS's proposals for new projects once the parties agreed that construction should be halted on the West Sump Expansion SEP, and after discussions with BCS that included counsel and technical experts on both sides, EPA selected the two projects proposed in the Second Modification (the "Substitute SEPs"). EPA determined that the Substitute SEPs, which would provide trucks and equipment to two local fire departments at an estimated cost of $1.7 million, should receive the same penalty mitigation percentage as the existing SEPs for emergency equipment, i.e., *double that* assigned to the West Sump Expansion SEP.  *Id.* ¶¶ 21, 33.  Because the mitigation percentage is "twice as high" for the Substitute SEPs as it is for the West Sump Expansion, the penalty mitigation amount for the Substitute SEPs is "slightly higher" than the penalty mitigation amount for the West Sump Expansion.  *Id.* ¶ 35.  The Second Modification does not, however, reduce the amount of the civil penalty that BCS has already paid under the Consent Decree.

In light of the changed circumstances BCS encountered while trying to complete the West Sump Expansion SEP, the government correctly concluded that BCS's donation of $1.7 million in trucks and equipment to local fire departments to improve chemical-firefighting capabilities is a fair, reasonable, and adequate replacement for the West Sump Expansion SEP on

which BCS has already spent more than $2.2 million: "[t]he Second Modification simply replaces an infeasible and unnecessary SEP with a project that will have more value for the community."  Mem. in Support of Mot. to Enter Second Modification of Consent Decree ("Mem.") at 11 (ECF No. 36).  BCS agrees.

## II.     BACKGROUND

### A.     The Underlying Action and Entry of the August 9, 2016 Consent Decree.

The United States filed this civil action for penalties and injunctive relief against BCS for violations of section 112(r) of the Clean Air Act ("CAA"), which imposes certain obligations on owners and operators of stationary sources that produce or handle certain extremely hazardous substances.  Compl. (ECF No. 3).  The government's claims arise out of a 2008 release from BCS's Methomyl production unit at its plant in Institute, West Virginia (the "Institute Plant"). The Institute Plant is located within the Institute industrial park, which is currently owned by a third party, but was owned by BCS at the time of the incident.  The parties were able to reach a settlement, and the original Consent Decree, which was entered by this Court on August 9, 2016, required BCS to pay a civil penalty of $975,000, to perform injunctive relief to reduce the likelihood of future releases at the Institute Plant and several other chemical processing plants around the country, and to perform SEPs valued collectively at $4.23 million.  Consent Decree (ECF No. 19).

One of the Consent Decree's original SEPs required BCS to expand a wastewater sump, known as the West Sump (the "West Sump Expansion SEP").  Declaration of Connie Stewart ("Stewart Decl.") at ¶ 8 (ECF No. 35-5).  The West Sump is designed to capture wastewater and stormwater associated with industrial activities on the west side of the Institute industrial park. This excess water is stored in the West Sump to allow the wastewater treatment system time to

5

catch up with the flow.  *Id.*  The West Sump Expansion SEP was intended to reduce the likelihood of overflows that by-pass the wastewater treatment system from the West Sump to the Kanawha River during extreme rain events, firefighting activities, or system failures.  *Id.*  The Consent Decree required BCS to allocate approximately $3.1 million for the West Sump Expansion SEP.  *Id.*  The Consent Decree also included a number of other SEPs, including the provision of emergency equipment to several fire departments.  *See* Consent Decree at 37 & Appx. F-M (ECF No. 19).  Because of the "significant oversight that would be required by EPA to monitor the implementation and effectiveness of the [West Sump Expansion] SEP" and "the public health and environmental benefit . . . would only occur in the event of a flood or other extreme event," EPA assigned a "much lower" penalty mitigation percentage to the West Sump Expansion SEP than to the other projects.  Hunt Decl. ¶ 22.

Before the Consent Decree was entered and separate and apart from any obligation thereunder, BCS worked to reduce the number and volume of overflows from the West Sump to the Kanawha River.  Stewart Decl. ¶ 10.  In 2012, BCS began a series of projects to reduce the likelihood that untreated wastewater would overflow from the West Sump (the "Mitigation Efforts").  *Id.*  Over the next three years, BCS completed the Mitigation Efforts, which included installing two new electric pumps along with new Programmable Logic Controls ("PLCs") for the new pumps in November 2012; adding both a new, diesel-powered back-up pump and additional personnel with responsibilities for the West Sump in August 2013; adding improved PLCs and instrumentation for the pumps in September 2013; installing suction strainers and plugged the pathway from the West Sump in April 2014; and adding a submersible pump in September 2015.[3]  *Id.*  The Mitigation Efforts were not required by any governmental agency,

---

[3] In 2015, BCS transferred ownership of the entire Institute industrial park to a third party, but responsibility for the wastewater system was not transferred until November 2016.  Stewart Decl. ¶ 4.

law, consent decree, or permit; they were a voluntary, independent effort by BCS to protect the

Kanawha River.  BCS spent approximately $820,000 on the Mitigation Efforts.  *Id.* ¶ 12.

**B.    Problems With the Implementation of the West Sump Expansion SEP and the Need to Modify the Consent Decree.**

After entry of the Consent Decree in August 2016, BCS began on-site work for the West

Sump Expansion SEP.  *Id.* ¶ 13.  In late 2016, while excavating the West Sump, BCS first

encountered buried structural debris and unanticipated soil impacts.  *Id.* ¶ 14.  These obstacles

presented a health and safety risk to construction workers.  Initially, BCS responded by

redesigning or relocating elements of the excavation in an attempt to avoid debris and impacts.

*Id.*  But eventually, it became clear that overcoming these challenges (if even possible) would

significantly increase the cost of the project.

Further, the West Sump Expansion SEP's environmental goal to prevent overflows from

the West Sump into the Kanawha River had been achieved by the Mitigation Efforts.  *Id.* ¶ 15.

In the time since the new pumps were installed in 2012 and 2013, the West Sump has not

overflowed since August 30, 2013, a period that included at least one 100-year rain event.  *Id.* ¶

11.  Based on these data, BCS determined that the Mitigation Efforts had successfully prevented

overflows over a several-year period and that completion of the West Sump Expansion SEP

would not significantly improve environmental protection to the Kanawha River beyond that

which the Mitigation Efforts provided.  *Id.* ¶ 15.

In March 2017, BCS approached the government to discuss the difficulties it was

encountering in implementing the West Sump Expansion SEP, as well as the data on the

Mitigation Efforts.  *Id.* ¶ 16.  Those discussions led to a meeting at the offices of EPA Region 3

on May 1, 2017.  *Id.*  During the meeting, BCS provided detailed information to EPA's experts

regarding the changed circumstances it encountered while implementing the West Sump

4843-5011-5929.v1

Expansion SEP, as well as the Mitigation Efforts. The government recognized that soil contamination along with other conditions have "significantly complicated the construction activities" for the West Sump Expansion SEP and that BCS's Mitigation Efforts "appear to have substantially reduced or eliminated overflows of untreated process wastewater and [BCS] has provided Plaintiff with evidence demonstrating that no overflows have occurred since late 2013." Second Modification of Consent Decree at 2 (ECF No. 25-1); *see also* Mem. at 5. BCS and EPA agreed that construction of the West Sump Expansion SEP should be halted. Hunt Decl. ¶ 30. At that time, BCS had spent approximately $2,203,810 on initial and final engineering design, site preparation, and significant excavation activities in furtherance of the project. Stewart Decl. ¶ 13.

### C.     The Development of Possible Alternatives to the West Sump Expansion SEP.

BCS worked to develop possible alternative SEPs to the West Sump Expansion SEP. As part of that effort, BCS employees reached out to several local fire departments to inquire whether they needed upgraded equipment to better respond to chemical incidents. Hunt Decl. ¶ 33. BCS proposed several Substitute SEPs to EPA for review. EPA evaluated BCS's proposals and "rejected many of th[e] SEP proposals as being inconsistent with the *SEP Policy* because they lacked sufficient nexus to the alleged underlying CAA violations." Hunt Decl. ¶ 31. EPA approved two proposed SEPs that met the agency's criteria and guidelines as laid out in the *SEP Policy*: emergency response equipment for the Jefferson Volunteer Fire Department and the Institute Volunteer Fire Department, including fire trucks and enhanced equipment for individual firefighters. Hunt Decl. ¶ 32. The estimated projected cost for the two Substitute SEPs is $1,727,792. *Id.* ¶ 34.

4843-5011-5929.v1

EPA's *SEP Policy* sets forth several criteria for evaluating proposed projects and determining the appropriate mitigation percentage. Here, EPA determined that the Substitute SEPs performed strongly against three of those criteria:

> (1) Significant, Quantifiable Benefits to Public Health and/or the Environment, because the SEPs improve the response capability of the response agencies tasked with responding to chemical releases in the vicinity of the Institute facility; (2) Environmental Justice, because the SEPs benefit the surrounding community, which is located in an environmental justice area; and (3) Community Input, because the SEPs were selected after receiving input as to response needs from local emergency responders. (Hunt Decl. ¶ 33).

EPA also determined that the Substitute SEPs had a "closer nexus" to the underlying CAA violation than the West Sump Expansion SEP because the equipment would allow responders to address releases to the air. *Id.* Accordingly, EPA assigned a mitigation percentage to the Substitute SEPs equal to that assigned to the other emergency equipment SEPs under the Consent Decree, a percentage twice as high as that which was assigned to the West Sump Expansion SEP. *Id.* ¶¶ 21, 33.

### D.      The Lodging of the Proposed Second Modification and the Present Motion.

On August 31, 2017, the United States filed its Notice of Lodging of Second Modification of the Consent Decree (ECF No. 25). Therein, the government averred that the "new alternative SEPs better advance the objectives of chemical accident prevention laws that form the underlying basis of the enforcement action." Second Modification of Consent Decree at 2. The government went on to explain that, "because the new alternative SEPs more effectively achieve and promote one or more of the critical factors EPA uses to evaluate projects under the EPA SEP policy, EPA approved a higher mitigation credit than the credit assigned to the West Sump Expansion SEP." *Id.* In accordance with the regulations, 28 C.F.R. § 50.7, the United States published notice of the proposed second modification in the Federal Register and

9

received public comments from several parties, including the Natural Resources Defense Council ("NRDC"), which has filed a motion to intervene in this action, opposed by both BCS and the government.

On December 6, 2017, the government filed its memorandum in support of its motion to enter the Second Modification (ECF No. 36). The government explained that because the $3.1 million West Sump Expansion SEP was given a "fairly low" penalty mitigation credit and the $1.7 million Substitute SEPs were given a penalty mitigation credit that was "twice as high," "if BCS has proposed the replacement SEPs at the time the Parties were negotiating the original Consent Decree, they would have generated a slightly higher penalty mitigation amount (in dollars) than the West Sump Expansion" and BCS would have paid a penalty slightly lower than $975,000. Mem. at 3, 6, 16; Hunt ¶ 35. The government argues that the Second Modification is fair, reasonable, and adequate, because it "simply replaces an infeasible and unnecessary SEP with a project that will have more value for the community." Mem. at 11. The Second Modification, the government says, continues to impose a "significant penalty" on BCS and actually increases total BCS's out-of-pocket costs to comply with the terms of the settlement. *Id.* at 12.

BCS respectfully requests that this Court grant the government's motion and approve the Second Modification of the Consent Decree.

## III.     ARGUMENT

### A.     Legal Standards.

When reviewing a proposed consent decree, a court is required to determine whether the decree is fair, adequate, and reasonable, and that it is not illegal, a product of collusion, or against the public interest. *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999). A court evaluates a consent decree in light of the public policy favoring settlement. *See*

*generally Crandell v. United States*, 703 F.2d 74 (4th Cir. 1983). "[This] policy . . . is strengthened when a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement.'" *United States v. Montrose Chem. Corp of Ca.*, 50 F.3d 741, 746 (9th Cir. 1995) (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)). Indeed, the presumption in favor of approving the terms of a settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991) (cited with approval in *United States v. E.I. du Pont de Nemours and Co.*, No. 5:16-cv-00082, 2017 WL 3220449, at *12 (W.D. Va. July 28, 2017)). Here, the Court has already found the Consent Decree to be fair, reasonable, and adequate. For purposes of the present motion, the Court should limit its review to the new terms of the proposed Second Modification.

A court may modify a consent decree under Federal Rule of Civil Procedure 60(b) if the consent decree is no longer equitable or if other reasons justify the modification. Courts will allow for modification of a consent decree if (1) a significant change in factual condition or law has occurred and (2) the proposed modification is suitably tailored to the changed circumstances. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 391 (1992). "For example, 'modification may be warranted when changed factual circumstances make compliance substantially more onerous . . . or when enforcement of the decree without modification would be detrimental to the public interest.'" *Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., LLC*, 744 F. Supp. 2d 561, 567 (S.D. W. Va. 2010) (quoting *Rufo*, 502 U.S. at 384). Further, the objective of the relevant

federal law should be considered in determining whether to grant a motion to modify the consent decree. *Ohio Valley Envtl. Coal.*, 744 F. Supp. 2d at 567.

The government suggests that the standards set forth in *Rufo* may not apply where all the parties to the underlying lawsuit support the proposed modification because in *Rufo,* one party sought entry of the proposed modification over another party's objection. Mem. at 9-10. The Court need not decide that question because the substantial obstacles BCS encountered while trying to implement the West Sump Expansion SEP satisfy the *Rufo* standard, and the Substitute SEPs are suitably tailored to those changed circumstances.

**B.**     **The Second Modification is Fair, Adequate, and Reasonable.**

*1.*     *Fairness.*

Fairness has both "procedural" and "substantive" components. *See United States ex rel. McCoy v. Am. Cyanamid Co.*, No. 2:93-0654, 1997 U.S. Dist. LEXIS 4692, at *23 (S.D. W.Va. Feb. 19, 1997). "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons Eng'g Corp.*, 899 F.2d at 86  (internal citations omitted). In approving the original Consent Decree, this Court observed, "the record indicates that the United States and counsel for defendant engaged in years of arm's length negotiations and [have had] the opportunity to explore each other's positions at length." Mem. Opinion and Order at 12 (ECF No. 18). The parties likewise engaged in arm's length, adversarial negotiations in arriving at the Second Modification. EPA and BCS negotiated the Second Modification over a period of approximately six months, beginning in early March 2017 and culminating in August 2017 when the government filed its Notice of Lodging. *See* Hunt Decl. ¶¶ 25-36.

The government did not rubber-stamp the Substitute SEPs. BCS proposed a number of projects over the course of the parties' discussions, "many" of which EPA rejected because they

lacked a sufficient nexus to the underlying CAA violations. *Id.* ¶ 31. The two projects that EPA did approve were carefully scrutinized by the agency for compliance with the *SEP Policy* and measured against the criteria for assigning a mitigation percentage. *Id.* ¶ 33. EPA alone determined the mitigation percentage that should apply to the Substitute SEPs. *See id.* Throughout the entire process both EPA and BCS were represented by sophisticated outside counsel and in-house technical specialists.

There can be no doubt that the Second Modification was the product of "arms length settlement negotiations conducted in good faith by experienced legal counsel," which is generally seen as the best indicia of procedural fairness. *See United States v. Wallace*, 893 F. Supp. 627, 632 (N.D. Tex. 1995). Moreover, the parties did not negotiate in a vacuum; EPA invited and received public comments on the Second Modification in accordance with 28 C.F.R. § 50.7. *See* Notice of Lodging (EFC No. 25). The government received and considered three comments from the public regarding the Second Modification. Mem. at 13. In its memorandum supporting its motion to enter the Second Modification, the government addressed and responded to each of these comments in turn, concluding ultimately that the concerns raised by the commenters were unfounded or did not present sufficient reason why the Second Modification should not be entered. *Id.* at 13-18. The process used to arrive at the Second Modification was procedurally fair: "the United States would not, and is not, giving away its hard won bargain." *Id.* at 15.

Substantive fairness is about "corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *E.I. du Pont de Nemours and Co.*, 2017 WL 3220449, at *14. "In determining whether a decree is 'fair,' courts have considered the following: 'the strength of plaintiff's case, the good faith efforts of the negotiations, the opinions

of counsel, and the possible risk involved in the litigation if the settlement is not approved." *Akzo Coatings*, 949 F.2d at 1435 (quoted in *E.I. du Pont de Nemours and Co.*, 2017 WL 3220449, at *14).  Further, where the proposed consent decree resolves claims for statutory violations, the substantive terms of the proposed settlement should be "faithful to the objectives of the governing statute." *Cannons Eng'g Corp.*, 899 F.2d at 84.  The relevant inquiry is *not* "whether the settlement is one which the court itself might have fashioned, or considers ideal." *Id.*

The Second Modification, like the original consent decree, imposes what the government calls a "significant penalty" on BCS that includes the same $975,000 civil penalty, the same injunctive relief obligations, and 13 other SEPs.  *See* Mem. at 12.  Further, the Substitute SEPs "are faithful to the objectives" of section 112(r) of the CAA.  EPA determined that the Substitute SEPs "have a closer nexus to the underlying CAA Section 112(r) violations than the West Sump Expansion SEP" because they would allow emergency responders "to address releases to the air," whereas the West Sump Expansion SEP "was focused on preventing wastewater discharges."  Hunt Decl. ¶ 33.  The Substitute SEPs offer "[s]ignificant, [q]uantifiable [b]enefits to [p]ublic [h]ealth and/or the [e]nvironment," advance "[e]nvironmental [j]ustice," and reflect "[c]ommunity [i]nput," consistent with the *SEP Policy. Id.*  EPA determined that compared to West Sump Expansion SEP, on which BCS has already spent millions, the Substitute SEPs provide "more value for the community."  Mem. at 11.

Some commenters have alleged that BCS will have to pay less money under the Second Modification, thereby decreasing the deterrent effect of the Settlement, and characterize the difference in estimated cost between the Substitute SEPs and the West Sump Expansion SEP as a "windfall" for BCS.  *See, e.g.*, Email from Jane Gilbert Re: Bayer 2008 Institute Explosion

14

Settlement (ECF No. 35-1); Comments to Proposed Second Modification of Consent Decree by People Concerned About Chemical Safety, Inc., *et al.* at 1-2 (ECF No. 35-2).  The government fully considered these arguments and concluded that the Second Modification would not diminish the original settlement or result in a "windfall" for BCS.  *See* Mem. at 16-17.  Indeed, because of the higher mitigation percentage applied to the estimated cost of the Substitute SEPs, the government concluded that "the Second Modification should be viewed as more favorable to [the] United States than the original Consent Decree."  *Id.* at 16.  The Second Modification is not a "windfall" for BCS, because the Second Modification would increase BCS's out-of-pocket expenses from $3.1 million (the estimated cost to implement the West Sump Expansion SEP) to $3.9 million (the estimated cost to implement the Substitute SEPs plus the money BCS has already spent on the West Sump Expansion SEP).  This increase in costs is on top of the previous Agreed Non-Material Modification of Consent Decree (ECF No. 21-1), which increased BCS' total estimated costs to implement the SEPs from $4,203,819[4] to $4,422,978, due to changed needs of the recipients of the emergency equipment.  Hunt Decl. ¶ 24.

Moreover, the data suggest that BCS's Mitigation Efforts have obviated the need to complete the West Sump Expansion SEP altogether because there have been no overflows from the West Sump since August 2013, a period that included at least one 100-year rain event. Stewart Decl. ¶ 11.  Indeed, the environmental impacts discovered during implementation of the West Sump Expansion SEP represent changed "factual circumstances [that] make compliance substantially more onerous" under the O*hio Valley Environmental Coalition* standard.  *Ohio Valley Envtl. Coal.*, 744 F. Supp. 2d at 567.  Further, the modification would substantially

---

[4] For the Court's clarification, the original estimated cost of the SEPs was incorrectly listed as $4,203,813 in the Agreed Non-Material Modification.  *See* Hunt Decl. n.1.

advance the public interest, by diverting resources from a project with little environmental benefit to ones with substantial benefit.  *See id.*

### 2.    *Adequacy and Reasonableness.*

Assessing adequacy and reasonableness is a "multifaceted exercise" whereby a number of factors may be considered, including the effectiveness of the proposed consent decree, the strength of the parties litigating, and the public interest.  *See E.I. du Pont de Nemours and Co.*, 2017 WL 3220449, at *14  (citing *Cannons Eng'g*, 800 F.2d at 89).  Courts in this district have found an environmental settlement to be fair, adequate, and reasonable where the settlement was negotiated at arm's length and was designed to penalize the defendant "appropriately" for any violations of federal statute and to serve as a deterrent to future similar conduct.  *See United States v. City of Welch, W. Va.*, No. 1:11-00647, 2012 WL 385489, at *3 (S.D. W.Va. Feb. 6, 2012).  As with fairness, testing the adequacy of a consent decree requires a court to ensure that the settlement is in the public interest.  *See United States v. North Carolina*, 180 F.3d at 581.

The Second Modification penalizes BCS "appropriately" and does not decrease the deterrence effect of the settlement that this Court has previously approved.  As explained in the government's brief, the Second Modification would continue to impose the same civil penalty, injunctive relief, and SEP obligations on BCS, with the exception of replacing one "infeasible and unnecessary SEP with a project that will have more value for the community."  Mem. at 11.  BCS's total out-of-pocket costs will increase by more than three-quarters of a million dollars,[5] and BCS will continue to pay a civil penalty that is greater than that which it would have been assigned had the Substitute SEPs been a part of the original Consent Decree.  Mem. at 16.  Notwithstanding the fact that BCS has permanently scaled down operations at the Institute Plant

---

[5] BCS's estimated out-of-pocket costs are now $3.9 million, including the $2.2 million BCS has already expended on the West Sump Expansion, plus $1.7 million for the Substitute SEPs.  The estimated cost of the West Sump Expansion SEP was $3.1 million, $800,000 less.

4843-5011-5929.v1

and ceased the production process that resulted in the explosion, BCS's civil penalty, injunctive

relief obligations, and the SEPs together constitute sufficient deterrence against future violations.

Moreover, the government has found that one commenter's proposals to fund a public health

study and construct an expanded evacuation route may be untenable or inconsistent with the *SEP*

*Policy*. Mem. at 17-18.

The Second Modification is also in the public interest—more so the government avers—

than the original Consent Decree. The reasons for this are two-fold. One, the Substitute SEPs

would provide "more value for the community" because they "offer a significant quantifiable

benefit to the public health and/or the environment, are located in an environmental justice area,

and were selected after input from the affected community." Hunt Decl. ¶ 35; Mem. at 11. In

contrast, the government has concluded that completing the West Sump Expansion SEP "would

likely have little or no environmental benefit." Mem. at 15. Two, because the Substitute SEPs

are entitled to a mitigation percentage that is twice as high as that awarded to the West Sump

Expansion SEP, the penalty mitigation amount (in dollars) for the Substitute SEPs is also

"slightly higher." Put another way, the United States comes out ahead under the Second

Modification. *See* Mem. at 16. The Second Modification is both adequate and reasonable.

**C.      There is No Evidence of Collusion Between BCS and the Government.**

The standards governing judicial consideration of a proposed consent decree include

consideration of any evidence of collusion between the parties:

> In considering whether to enter a proposed consent decree, a
> district court should be guided by the general principle that
> settlements are encouraged. Nevertheless, a district court should
> not blindly accept the terms of a proposed settlement. Rather,
> before entering a consent decree the court must satisfy itself that
> the agreement "is fair, adequate, and reasonable" and "is not
> illegal, a product of collusion, or against the public interest." In
> considering the fairness and adequacy of a proposed settlement, the
> court must assess the strength of the plaintiff's case . . . . In

17

> particular, the "court should consider the extent of discovery that
> has taken place, the stage of the proceedings, the ***want of collusion***
> in the settlement and the experience of plaintiffs' counsel who
> negotiated the settlement."

*United States v. North Carolina*, 180 F.3d at 581 (quoted in *Ohio Valley Envtl. Coal. v.*

*Pocahontas Land Corp.*, No. 2:15-15515, 2017 WL 988115, at *2 (S.D. W. Va. Mar. 14, 2017)

(internal citations omitted) (emphasis added)).

Upon entry of the original Consent Decree, the Court found "no indication in the record

that the proposed consent decree is the product of collusion between the Government and

[BCS]." Order at 13.  The Court should make the same finding here.  The parties engaged in

arm's length adversarial negotiations over a period of several months.  EPA did not immediately

accept BCS's proposals for alternative projects; EPA carefully scrutinized each project for

compliance with the *SEP Policy* and rejected "many" projects for their failure to meet the criteria

set forth in that policy.  *See* Hunt Decl. ¶ 31.  Finally, and not to be discounted, none of the

public comments assert or even suggest that the Second Modification was the product of

collusion between the parties.

### D.     The Second Modification Is Reasonably Tailored to Changed Circumstances.

A consent decree may be modified "when changed factual conditions make compliance

with the decree substantially more onerous" or when the decree "proves to be unworkable

because of unforeseen obstacles." *Rufo*, 502 U.S. at 384.  Both circumstances are present here.

It was initially estimated that the West Sump Expansion SEP would cost approximately $3.1

million to complete.  Consent Decree at 16.  To date, BCS has spent approximately $2.2 million

in an effort to implement the West Sump Expansion SEP; construction is not complete, nor can it

practicably be completed.  Although BCS initially attempted to redesign or relocate the

excavation to avoid debris and soil impacts encountered during excavation, it eventually became

clear that completing the West Sump Expansion SEP would be impracticable, and the government agreed that construction should be halted.  Stewart Decl. ¶ 14; Hunt Decl. ¶ 30. There is no serious dispute that these events constitute 'a significant change in circumstances that warrants revision of the decree.'  Mem. at 10 (quoting *Rufo*, 502 U.S. at 384).

Nevertheless, this Court needs to satisfy itself that the Second Modification is "suitably tailored to the changed circumstance."  *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 827 (4th Cir. 2005) (citing *Rufo*, 502 U.S. at 383).  In this case, the Substitute SEPs are a "suitable" replacement for the West Sump Expansion SEP because they neither decrease the civil penalty imposed on BCS nor BCS's out-of-pocket costs, and they offer "more value for the community."  Mem. at 11.  The Substitute SEPs are similar to SEPs that are already in the Consent Decree for the provision of emergency equipment to local fire departments.  Consent Decree Appx. F-M.  It is not surprising then that EPA's in-house experts have determined that the Substitute SEPs comply with *SEP Policy*.  Hunt Decl. ¶ 33.  Further, the Substitute SEPs offer greater value to the community because they have "closer nexus to the underlying CAA Section 112(r) violations than the West Sump Expansion SEP."  *Id.*  The Substitute SEPs are suitably tailored to the changed circumstances facing the parties in this case.

     **E.**    **Generalized Concerns About the Comparative Cost to Implement the Substitute SEPs Do Not Alone Justify Rejecting the Modified Consent Decree.**

Some of the public comments concerning the Second Modification raised concerns about an alleged "windfall" for BCS because, they reasoned, the Substitute SEPs would cost less to implement than the West Sump Expansion SEP.  As a factual matter, there is no "windfall" here. The Substitute SEPs will cost BCS an additional $1.7 million above the $2.2 million it has already paid towards the West Sump Expansion SEP.  Together, these amounts exceed the $3.1 million estimated cost of the West Sump Expansion SEP.  Although not a part of the Consent

Decree, BCS has also spent $829,000 on the Mitigation Efforts, which efforts, incidentally, have accomplished the principal objective of the West Sump Expansion SEP: to prevent overflows of untreated discharges to the Kanawha River.  Moreover, EPA has determined that the Substitute SEPs are entitled to greater penalty mitigation (in dollars) than the West Sump Expansion SEP; yet BCS's civil penalty will not change under the Second Modification.  The Court should affirm the government's conclusion that "the United States would not, and is not, giving away its hard won bargain."  Mem. at 15.

## IV.   CONCLUSION

For all of the reasons stated above, the Second Modification is fair, adequate, and reasonable, consistent with the objectives of section 112(r) of the CAA, and in the public interest.  Finally, the Second Modification is suitably tailored to the changed circumstances BCS encountered while implementing the West Sump Expansion SEP.  Accordingly, BCS joins the United States in requesting that the Court approve the Second Modification of Consent Decree.

A.  L. Emch (WVSB# 1125)
JACKSON KELLY PLLC
500 Lee Street East
Suite 1600
Charleston, WV 25301-3202
(304) 340-1172
aemch@jacksonkelly.com


Eileen Millett, Esquire
PHILLIPS NIZER LP
666 Fifth Avenue
New York, NY 10103
(212) 841-0529
Emillett@phillipsnizer.com

20

4843-5011-5929.v1

Edward F. McTiernan, Esquire
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8199
edward.mctiernan@apks.com

*Attorneys for Defendant*
*Bayer CropScience LP*

4843-5011-5929.v1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

UNITED STATES OF AMERICA,

Plaintiff,

v.                                          Civil Action No. 15-13331

BAYER CROPSCIENCE LP,

Defendant.

## CERTIFICATE OF SERVICE

I, A. L. Emch, counsel for Defendant Bayer CropScience LP, do certify that on 20

December 2017, filing and service of the "Defendant Bayer CropScience LP's Memorandum

Supporting Entry of Second Modification of Consent Decree" was made via the CM/ECF filing

system, which will provide notification and a copy of the filing to all counsel of record.

_____

A.  L. Emch (WVSB# 1125)

4813-5439-9833.v1