UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA,

       Plaintiff,

v.                          Civil Action No. 2:15-cv-13331

BAYER CROPSCIENCE LP,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending is the motion to intervene of Pamela L. Nixon;

Kathy Ferguson; People Concerned About Chemical Safety, Inc.

("PCACS"); and Natural Resources Defense Council, Inc. ("NRDC")

(together, "Citizen Plaintiffs"), filed November 8, 2017.

I. Background

       On August 28, 2008, a runaway chemical reaction

occurred inside a pressurized vessel at a chemical plant in

Institute, West Virginia (the "Institute Plant"), owned and

operated at the time by defendant Bayer CropScience LP

("Bayer").  (2015 Hunt Decl. ¶ 9; Daniel Decl. ¶ 8; Shabazz

Decl. ¶ 7.)  The vessel was located in the Methomyl unit of the

Institute Plant.  (2015 Hunt Decl. ¶ 9.)  Methomyl is a

pesticide used in a process to make Larvin, the finished

product, which is also a pesticide.  (<u>Id.</u> ¶¶ 9, 25.)  The vessel

exploded, spraying and igniting about 2,500 gallons of its highly flammable contents and causing a fire that lasted more than four hours. (E.g. 2015 Hunt Decl. ¶ 8.) The explosion killed two Bayer employees, and over 40,000 area residents were ordered to shelter in place for more than three hours. (Id. ¶ 8; Daniel Decl. ¶ 8; Shabazz Decl. ¶ 7.)

At the time of the explosion, Bayer processed several chemical compounds at the Institute Plant classified as "extremely hazardous substances" under Section 112(r) of the Clean Air Act, 42 U.S.C. § 7412 (2016).[1] (See Daniel Decl. ¶ 9; Shabazz Decl. ¶ 9.) Congress enacted Section 112(r) in an effort "to reduce hazardous air pollutants." Sierra Club v. EPA, 863 F.3d 834, 835 (D.C. Cir. 2017). Specifically, the objective of Section 112(r) is "to prevent the accidental release and to minimize the consequences of any such release of any . . . extremely hazardous substance." 42 U.S.C. § 7412(r)(1). An "extremely hazardous substance" is one "known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment." Id. § 7412(r)(3). Since the explosion, Bayer has limited its

---

[1] In particular, debris hurled from the exploding vessel struck the ballistic shield of a tank containing methyl isocyanate - the chemical compound central to the 1984 explosion in Bhopal, India - but did not damage the tank itself. (2015 Hunt Decl. ¶ 9; Nixon Decl. ¶ 3.)

2

Institute Plant operations to the production of Larvin, which evidently does not require the use of any chemicals considered an extremely hazardous substance.  (See Daniel Decl. ¶¶ 13-16.)  Methomyl, now purchased from another source rather than produced on-site, is not an extremely hazardous substance.  (See id. ¶ 16.)[2]

In a January 2011 report relating to the 2008 explosion, the investigation team for the United States Chemical Safety and Hazard Investigation Board ("CSB") - tasked with, inter alia, investigating industrial chemical accidents involving extremely hazardous substances, 42 U.S.C. § 7412(r)(6) - "determined that the runaway chemical reaction and loss of containment of the flammable and toxic chemicals resulted from deviation from the written start-up procedures, including bypassing critical safety devices intended to prevent such a condition."  (Wang Decl., Attach. 4, CSB Investigation Report at 1.)  Other governmental agencies also investigated the explosion, including the Environmental Protection Agency

---

[2] Methomyl is still present on-site and is flammable.  (Id.)  Thus, the Institute Plant remains subject to the "general duty" clause of Section 112(r), which requires Bayer "to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur."  42 U.S.C. § 7412(r)(1).

("EPA"), (e.g., 2017 Hunt Decl. ¶ 7), most prominent here because it is tasked with regulating under Section 112 as well as general enforcement of the Clean Air Act, see 42 U.S.C. §§ 7412(r)(7), 7413(b).

On September 21, 2015, at the request of the EPA, the United States filed a complaint against Bayer in this court, alleging violations of Section 112(r) at the Institute Plant. (Compl. at 1, ¶ 1; see also 2015 Hunt Decl. ¶¶ 18-19 (stating that EPA concluded Bayer violated Section 112(r) and recommended civil action).) On August 9, 2016, this court approved a consent decree between the United States and Bayer. (See ECF #18 (memorandum opinion and order); ECF #19 ("Consent Decree").) The consent decree obligated Bayer to pay $975,000 as a civil penalty, submit to specified injunctive relief, and carry out various supplemental environmental projects ("SEP") at an ultimate estimated cost of $4.4 million, of which $3.1 million was estimated for the "west sump" project. (See generally Consent Decree.)[3]

As explained by the EPA's Supplemental Environmental Projects Policy, a SEP is

---

[3] A "sump" is "a pit or reservoir serving as a drain or receptacle for liquids[,] such as . . . a pit at the lowest point in a circulating or drainage system." Sump, Merriam-Webster (2018), https://www.merriam-webster.com/dictionary/sump.

>an environmentally beneficial project or activity that
>is not required by law, but that a defendant agrees to
>undertake as part of the settlement of an enforcement
>action.  SEPs are projects or activities that go
>beyond what could legally be required in order for the
>defendant to return to compliance, and secure
>environmental and/or public health benefits in
>addition to those achieved by compliance with
>applicable laws.

(Wang Decl., Attach. 3, U.S. EPA, Supplemental Environmental
Projects Policy (2015 Update) ("SEP Policy") at 1 (footnote
omitted).)  Any SEP must have a "sufficient nexus" to the
underlying violations of environmental law, which, generally
speaking, means that there must be a "relationship between the
violation and the proposed [SEP]."  See SEP Policy at 7-8; (2017
Hunt Decl. ¶ 11).  A sufficient nexus "is easier to establish if
the primary impact of the project is at the site where the
alleged violation occurred, at a different site in the same
ecosystem, or within the immediate geographic area."  SEP Policy
at 8.

        "A primary incentive for a defendant to propose a SEP
is the potential mitigation of its civil penalty."  Id. at 21.
A defendant may subtract up to 80% of the cost to implement a
SEP from its total civil penalty.  See id. at 24; (2017 Hunt
Decl. ¶ 14).  Thus, a defendant that agrees to complete a SEP
will pay a lower civil penalty than the defendant otherwise
would have without a SEP.  (See SEP Policy at 21.)  While

5

mitigation is determined on a case-by-case basis, a SEP that
better achieves the EPA's criteria generally results in a
greater mitigation.  See id. at 20; (2017 Hunt Decl. ¶ 13).

Of particular relevance here, Bayer agreed to a SEP
under which it would expand the "west sump" of the Institute
Plant to "provide additional storage capacity to prevent
untreated process wastewater from overflowing into the Kanawha
River during heavy rain events, fire-fighting emergencies, and
process upsets." (Consent Decree ¶ VII.23.a; see generally id.,
App. B.)  In all, Bayer initially committed to spend an
estimated total of about $4.2 million on all SEPs described in
the consent decree, (id. ¶ VII.25.a), of which the west sump
comprised $3.1 million, (id. ¶ VII.25.a.i).  Later, Bayer agreed
to a non-material modification of the consent decree that
increased its total SEP costs to about $4.4 million.  (ECF #21
Attach. 1 at Recitals.)  Combined with a civil penalty of $975
thousand, (Consent Decree ¶ IV.8), Bayer's obligations totaled
around $5.4 million.

Prior to agreeing to the west sump SEP, Bayer had
begun implementing in November 2012 "a series of projects
[independent of the SEP] to reduce the likelihood of overflows
from the West Sump" at a cost of $800 thousand.  (2017 Stewart
Decl. ¶ 10.)  Because of those projects, the west sump has not

had an overflow since August 30, 2013.  (See id. ¶¶ 11, 15.)
Additionally, while excavating for the west sump SEP, Bayer
encountered subsurface conditions, including harmful soil
contaminants, that increased the cost of the SEP and exposed
Bayer's workers to health risks.  (Id. ¶ 14; 2017 Hunt Decl. ¶¶
25-26.)  For these reasons, Bayer, the Department of Justice,
and the EPA decided to halt construction of the west sump SEP.
(2017 Stewart Decl. ¶ 15; 2017 Hunt Decl. ¶¶ 27, 30.)  Bayer had
spent about $2.2 million of the $3.1 million on the SEP up to
that point.  (2017 Stewart Decl. ¶ 13; 2017 Hunt Decl. ¶ 30.)

　　　　Bayer then proposed a series of SEPs to replace the
west sump SEP.  (2017 Hunt Decl. ¶ 31; see also 2017 Stewart
Decl. ¶ 17.)  Mary A. Hunt, a Risk Management Program
Coordinator for the EPA, is "the lead technical member of the
[Clean Air Act] team for the judicial enforcement action"
against Bayer.  (2017 Hunt Decl. ¶¶ 1, 3, 7.)  She has served in
that role since the original investigation and enforcement
action against Bayer that culminated in the consent decree.
(Id. ¶ 7; 2015 Hunt Decl. ¶ 7.)  Her job duties include
"analyzing [SEPs]," "evaluat[ing] proposed SEPs to determine
benefit to public health and the environment in accordance with
EPA's SEP Policy," and "develop[ing] penalty calculations using
the applicable EPA penalty policy."  (2017 Hunt Decl. ¶ 5.)

7

Ultimately, after Hunt's evaluation, Bayer and the EPA agreed to two SEPs, one for each of two fire departments.  The two SEPs would require Bayer to purchase new fire trucks, "specialized equipment for chemical-firefighting," and other equipment for the Jefferson Volunteer Fire Department and the Institute Volunteer Fire Department.  (2017 Stewart Decl. ¶ 18; 2017 Hunt Decl. ¶ 32.)  Hunt determined that the two replacement SEPs are entitled to the same mitigation percentage that she previously assigned to other equipment purchase SEPs under the consent decree.  (2017 Hunt Decl. ¶ 35.)

The two replacement SEPs cost around $1.7 million, (2017 Stewart Decl. ¶ 18; 2017 Hunt Decl. ¶ 34), which is $1.4 million less than the $3.1 million cost of the west sump SEP. Correspondingly, the two replacement SEPs would lower Bayer's total monetary obligation under the consent decree from $5.4 million to $4 million, if one disregards the $2.2 million spent by Bayer on the now abandoned west sump SEP.  Nevertheless, the EPA determined that "the mitigation percentage of the [two] proposed replacement SEPs is higher than the percentage for the West Sump Expansion" to such a degree that, consequently, "the penalty mitigation amount [for the two replacement SEPs] is also slightly higher than the penalty mitigation amount for the West

Sump Expansion SEP." (2017 Hunt Decl. ¶ 35.) The actual
mitigation percentages are not given.

On August 31, 2017, the United States lodged the
Second Modification of Consent Decree (the "proposed
modification") in this court for approval. (See ECF #25,
Attach. 1 (second modification of consent decree).) The
proposed modification evinces the parties' agreement to the two
replacement SEPs. (See id. ¶¶ 1-5.) After receiving public
comments, the EPA concluded that the proposed modification is
"fair and reasonable."[4] (2017 Hunt Decl. ¶ 40.) "Although
[Bayer] has expended approximately [$2.2 million] on the [west
sump] SEP, in proposing the substitute SEPs . . . , [Bayer] does
not seek and does not expect to receive any credit for these
costs." (2017 Stewart Decl. ¶ 20.)

Citizen Plaintiffs oppose the proposed modification
and have moved to intervene "for the purpose of opposing any
reduction in the financial obligations of Bayer." (Mot. to
Interv. 1.) Citizen Plaintiffs seek to "propos[e SEPs] to
utilize funds Bayer . . . agreed to expend under the original

---

[4] On April 2, 2018, Bayer notified the court via letter that it
must re-file bids on the equipment required by the replacement
SEPs. (See ECF #47.) Although new regulatory requirements have
slightly driven up the cost of the firefighting equipment and
fire trucks, Bayer conveys its and the fire department's
continued desire to perform the replacement SEPs. (Id. at 2.)

Consent Decree," including "a medical health study of the affected community, and the development of an emergency evacuation plan for the Institute area that does not require evacuees to drive west, towards the chemical plant."  (Id.)

Citizen Plaintiffs claim that they were harmed by the 2008 explosion at the Institute Plant and that the decreased SEP spending under the consent decree as a result of the proposed modification would increase the likelihood and their fear of future incidents and deprive their communities of environmental and health benefits.  Pamela Nixon is a longtime member and current president of People Concerned About Chemical Safety and its predecessor organization, People Concerned About MIC (a reference to methyl isocyanate, an extremely hazardous substance as earlier noted).  (Nixon Decl. ¶¶ 2-3.)  PCACS' "purpose is to promote international human rights by advocating for chemical safety and by conducting public education regarding the risks of chemical operations and means of reducing such risks."  (Id. ¶ 7.)

Since 1993, Nixon has resided in South Charleston, West Virginia, which is about five miles east of Institute. (Id. ¶ 1.)  She recalls how she felt in the aftermath of the 2008 explosion:

> It is like a wave that engulfs you when you hear an
> explosion, you feel your home shake, you see the smoke
> and the glow of the fire in the sky, and not knowing
> what will happen next, you fear for the safety of your
> family.  When you live that close to a chemical plant
> you learn that every minute counts, and time was
> passing.

(Id. ¶ 11.)  She states that she "was very concerned that [she]

was being exposed to [methyl isocyanate] or other chemicals."

(Id. ¶ 14.)  Indeed, she blames the explosion for the re-

emergence in September 2008 of symptoms of her autoimmune

disease that she states went into remission in 1998.  (Id. ¶¶

15-16.)

Now "[b]ecause of Bayer's past behavior, [Nixon] and

others involved in PCACS fear that Bayer will not keep members

of the community safe."  (Id. ¶ 18.)  She also states that she

is fearful of future incidents at the Institute Plant.  (See id.

¶ 20, 22, 24.)

Kathy Ferguson has lived in Institute since 2013 after

"hav[ing] visited and lived [t]here [her] whole life."

(Ferguson Decl. ¶ 1.)  Her parents lived in Institute during the

explosion, and "[she] was terrified for her [mother] and [her]

father."  (Id. ¶ 14.)  She states that "[her] mother became ill

immediately after the . . . explosion" and died seven weeks

later.  (Id. ¶ 18.)  Ferguson remains concerned about potential

adverse health effects of living in close proximity to the
Institute Plant.  (See id. ¶¶ 18-22.)

Dr. Deborah Klimek joined the Natural Resources
Defense Council in 2003 "because [she] share[s] the [NRDC's]
goal of ensuring a clean, healthy environment for future
generations." (Klimek Decl. ¶ 1.)  The "NRDC's mission includes
the prevention and mitigation of health threats posed by toxic
chemicals and hazardous air emissions to protect and maintain
the health of NRDC members and their families." (Trujillo Decl.
¶ 6.)  Central to the NRDC's purpose is "[e]nsuring that
companies are held accountable for violations of anti-pollution
laws, including the Clean Air Act." (Id. ¶ 7.)  By joining the
NRDC, Klimek has "authorize[d it] to take legal action on . . .
her behalf to protect the environment and public health,
including protection from exposure to harmful chemicals and air
emissions." (Id. ¶ 5.)

Klimek has lived in South Charleston, West Virginia,
since 2003.  (Klimek Decl. ¶ 2.)  She notes that she was at home
during 2008 explosion, and she and her husband "were panicked
and confused about whether [they] should take [their] kids and
leave the house." (Id. ¶ 4.)  A denial of the proposed
modification "would help address [her] concerns" about living

12

near the Institute Plant and driving past it on her way to work. (<u>Id.</u> ¶¶ 6, 8.)

Citizen Plaintiffs argue that they may intervene as of right pursuant to Federal Rule of Civil Procedure 24(a). (Mem. Supp. 5, 12.) Alternatively, they contend that permissive intervention is proper pursuant to Rule 24(b) or that they should be allowed to participate as amici. (<u>Id.</u> 13.) Citizen Plaintiffs also request a hearing to address the fairness of the proposed modification. (<u>Id.</u> 21-22.)

The United States and Bayer both respond that Citizen Plaintiffs lack standing to intervene. (U.S. Resp. 7; Bayer Resp. 2.) If intervention is granted, the United States requests that its scope be limited to opposing the proposed modification. (U.S. Resp. 13.) As for participation as amici, the United States does not object to Citizen Plaintiffs' participation, (<u>id.</u> 15), although Bayer insists that there is no reason to grant amicus status, (Bayer Resp. 18). The United States disagrees with the necessity of a hearing in any event, (U.S. Resp. 15), while Bayer leaves the point unaddressed.

## II. Discussion

### A. Intervention as of Right and Article III Standing

To intervene in an action as of right pursuant to Federal Rule of Civil Procedure 24(a), a movant must (1) timely file a motion to intervene and (2) satisfy one of the two listed criteria.[5] The Supreme Court of the United States recently confirmed a third requirement, applicable here, deciding that (3) "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017). Further, an association like PCACS or the NRDC

> has standing to bring suit on behalf of its members
> when [1] its members would otherwise have standing to
> sue in their own right, [2] the interests at stake are
> germane to the organization's purpose, and [3] neither
> the claim asserted nor the relief requested requires

---

[5] Rule 24(a) states the following:

> On timely motion, the court must permit anyone to
> intervene who: (1) is given an unconditional right to
> intervene by a federal statute; or (2) claims an
> interest relating to the property or transaction that
> is the subject of the action, and is so situated that
> disposing of the action may as a practical matter
> impair or impede the movant's ability to protect its
> interest, unless existing parties adequately represent
> that interest.

Fed. R. Civ. P. 24(a).

14

the participation of individual members in the lawsuit.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000) (citing Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).

The United States and Bayer do not dispute that Citizen Plaintiffs' motion is timely, and they concede that Citizen Plaintiffs have an unconditional right to intervene under Section 304 of the Clean Air Act, 42 U.S.C. §§ 7604(a)(1), 7604(b)(1)(B),[6] (see U.S. Resp. 6; Bayer Resp. 9).  Nor do the United States and Bayer contest the latter two elements of associational standing: if Nixon and Klimek have standing, so do PCACS and the NRDC.  Consequently, the only matter in dispute is whether any of Nixon, Klimek, and Ferguson (together, the "local intervenors") have Article III standing.  For reasons explained below, the court concludes that they do not.

Article III of the Constitution of the United States limits the reach of the judicial power to "Cases" and

---

[6] Section 7604(a)(1) authorizes citizen suits against, inter alia, "any person . . . alleged to have violated . . . or to be in violation of . . . an emission standard or limitation under" the Clean Air Act.  42 U.S.C. § 7604(a)(1).  Section 7604(b)(1)(B) bars citizen suits when the federal or state government are prosecuting a Clean Air Act enforcement action but provides that "in any such action . . . any person may intervene as a matter of right."  Id. § 7604(b)(1)(B).

"Controversies." § 2, cl. 1. "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013) (internal quotation marks omitted) (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)). The requirement of standing is founded in separation-of-powers principles, "serv[ing] to prevent the judicial process from being used to usurp the powers of the political branches." Amnesty Int'l USA, 568 U.S. at 408.

Citizen Plaintiffs have the burden to establish Article III standing. See Town of Chester, 137 S. Ct. at 1651. To do so, Citizen Plaintiffs must show that

> (1) [the local intervenors] ha[ve] suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action . . . ; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Laidlaw, 528 U.S. at 180-81 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

Citizen Plaintiffs assert that the proposed modification "threatens injury to [the local intervenors]" in two ways.[7]  (Mem. Supp. 7.)  First, Citizen Plaintiffs claim that

---

[7] Citizen Plaintiffs also recite injuries that they suffered as a result the 2008 explosion, such as "extreme[] fright[] upon learning about the explosion . . . at the Institute [Plant]."

Bayer's reduced monetary obligation under the consent decree will diminish the decree's deterrent effect, correspondingly "increasing the likelihood that Bayer . . . will commit future violations" of Section 112(r) of the Clean Air Act at the Institute Plant.  (Id.; see also Reply Supp. 4-5.)  Second, Citizen Plaintiffs claim that there will be reduced SEP spending in the Institute area, which will allegedly deprive the local intervenors of environmental and health benefits otherwise provided by a comparable amount of spending, that is, the $3.1 million estimated for the expanded west sump SEP.  (See Mem. Supp. 7; Reply Supp. 14-15, 15 n.2.)  Citizen Plaintiffs assert that their alleged injuries would be redressed if the court rejects the proposed modification.  (Mem. Supp. 7.)

Beginning with the first injury, "[t]hreats or increased risk [may] constitute[] cognizable harm" as an imminent injury in fact.  Gaston Copper, 204 F.3d at 160; see also Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014).  "One does not have to await the consummation of threatened injury to obtain preventive relief."  Gaston Copper,

_____

(See Mem. Supp. 6-7.)  The United States aptly notes that the injuries directly stemming from the 2008 explosion are not traceable to the challenged action here, the proposed modification and accompanying reduced SEP spending under the consent decree, (U.S. Resp. 8), and those injuries thus have no bearing on the court's analysis.

204 F.3d at 160 (quoting <u>Babbitt v. United Farm Workers Nat'l Union</u>, 442 U.S. 289, 298 (1979)).  This is particularly true in the context of threatened environmental injury, which "is by nature probabilistic."  <u>Id.</u>  That said, to constitute an injury in fact for Article III standing purposes, a threatened injury must be "certainly impending," or there must be "a substantial risk that the harm will occur."  <u>Susan B. Anthony</u>, 134 S. Ct. at 2341 (internal quotation marks omitted) (quoting <u>Amnesty Int'l</u>, 568 U.S. at 414 n.5); <u>see also</u> <u>Beck v. McDonald</u>, 848 F.3d 262, 275 (4th Cir. 2017) (stating that threatened injury can satisfy Article III standing requirements as either certainly impending or a substantial risk).

Underlying injuries of this kind is the notion that the threatened harm is not pure speculation.  As the Supreme Court has explained, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes."  <u>Lujan</u>, 504 U.S. at 564 n.2 (internal quotation marks omitted); <u>see also</u> <u>Susan B. Anthony</u>, 134 S. Ct. at 2341 ("[T]he injury-in-fact requirement . . . helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." (internal quotation marks omitted)); <u>United States v. Students Challenging Regulatory</u>

18

Agency Procedures (SCRAP), 412 U.S. 669, 689 (1973) ("A
plaintiff must allege that he has been or will in fact be
perceptibly harmed by the challenged agency action, not that he
can imagine circumstances in which he could be affected by the
agency's action.  And it is equally clear that the allegations
must be true and capable of proof at trial.").

Courts thus routinely assess, in some form, whether
"there is a 'credible threat' that a probabilistic harm will
materialize." NRDC v. EPA, 735 F.3d 873, 878 (9th Cir. 2013)
(citing cases from the Ninth Circuit); see also, e.g., Sierra
Club v. EPA, 754 F.3d 995, 1001 (D.C. Cir. 2014) ("Because
[e]nvironmental and health injuries often are purely
probabilistic, the court has generally require[d] that
petitioners claiming increased health risks to establish
standing demonstrate a substantial probability that they will be
injured . . . ." (internal quotation marks omitted and
alterations in original)); Fla. State Conf. of the NAACP v.
Browning, 522 F.3d 1153, 1161 (11th Cir.) ("To be likely enough,
the threatened future injury must pose a 'realistic danger' and
cannot be merely hypothetical or conjectural."); Baur v.
Veneman, 352 F.3d 625, 637 (2d Cir. 2003) ("Given the
potentially expansive and nebulous nature of enhanced risk
claims, we agree that plaintiffs . . . must allege a 'credible

19

threat of harm' to establish injury-in-fact based on exposure to enhanced risk."); Pub. Interest Research Grp. v. Magnesium Elektron, 123 F.3d 111, 122-23 (3d Cir. 1997) (concluding that plaintiffs lacked standing because they could not "show any actual injury or credible threat of injury"); cf. Amnesty Int'l USA, 568 U.S. at 409 ("[W]e have repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient.") (second alteration and emphases in original) (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990), and citing Lujan, 504 U.S. at 565 n.2, 567 n.3; DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 345 (2006); Laidlaw, 528 U.S. at 190; Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979)).

The credibility analysis comports with the requirement that a threatened injury either be "certainly impending" or pose a "substantial risk" of occurring, Susan B. Anthony, 134 S. Ct. at 2341: an implausible threat is neither. Indeed, in Beck, the Fourth Circuit mirrored that analysis when it decided that the threatened injury posed by potential identity theft after a data breach was not imminent because the threat was "too speculative" to be certainly impending and that the risk posed was insubstantial. See 848 F.3d at 273-76.

In the present case, the United States notes that
Bayer's total out-of-pocket costs will actually increase under
the proposed modification because Bayer has already sunk $2.2
million into the west sump SEP while the two replacement SEPs
cost $1.7 million - a total of $3.9 million as opposed to the
west sump SEP's cost of $3.1 million.  (See U.S. Resp. 9 n.2;
id. 5-6.)  For that reason, the United States contends that the
"[proposed modification] will deter violations of the Clean Air
Act adequately and to a greater extent than the existing Consent
Decree."  (Id. 9 n.2.)  In other words, the United States
suggests that the allegedly increased risk of harm faced by
Citizen Plaintiffs is not credible.

The court agrees.  It is illogical that Bayer would be
less deterred from committing future violations of Section
112(r) of the Clean Air Act at the Institute Plant having spent
more money overall.  Although Bayer does not seek credit for its
west sump SEP expenditures in asking the court to approve the
proposed modification, (2017 Stewart Decl. ¶ 20), the reality
for purposes of any reduced deterrent effect is that Bayer's
total expenditures will wind up $800 thousand more if the court
approves the proposed modification.

Citizen Plaintiffs contend that "it was Bayer's failed
implementation of the [west] sump SEP that increased its out-of-

pocket costs." (Reply Supp. 9.) Ostensibly, Citizen Plaintiffs
ask the court to ignore the $2.2 million Bayer spent on the west
sump SEP for that reason. Further, Citizen Plaintiffs insist
that, because the money spent on the west sump SEP was
apparently the result "of poor planning or bad luck," Bayer will
be deterred only from "agreeing to future SEPs with a high risk
of being useless or impracticable." (Id.) These are
distinctions without a difference. In the future, Bayer would
doubtlessly factor into its risk assessment the possibility that
it may wind up sinking significant sums into fruitless projects
that (A) contribute nothing to its business operations, (B)
contribute nothing to its ability to meet ongoing regulatory
obligations, and (C) do not serve to its credit in satisfying
any assessment of civil penalties. Accordingly, there is no
credibility to Citizen Plaintiffs' assertion that the local
intervenors will face an increased risk of harm if the court
approves the proposed modification. Citizen Plaintiffs' first
alleged injury is far too speculative to found Article III
standing.

Turning to the second alleged injury, Citizen
Plaintiffs argue that "[the local intervenors] are injured by
the loss of environmental and health benefits from reduced SEP
spending" under the consent decree as modified. (Id. 15 n.2.)

In effect, Citizen Plaintiffs claim that they are injured because the $1.7 million cost of the two replacement SEPs is a de facto reduction in benefits provided to the community when compared to a $3.1 million SEP.  (See id. 14-16.)  Fundamental to Citizen Plaintiffs' contention is the assumption that benefits are congruent with dollars spent.  They claim that a "court order denying the proposed modification will prevent the reduction in SEP spending and thereby redress [their] injury." (Id. 16.)  For reasons explained below, this alleged injury does not support standing.

     Citizen Plaintiffs do not describe what benefits the local intervenors will lose, nor do Citizen Plaintiffs explain how or when.  The sole basis of Citizen Plaintiffs' alleged injury is that the two replacement SEPs cost less than $3.1 million.  But, similar to the conclusion regarding the first alleged injury, there is significant cause to doubt the veracity of that theory.  Gaston Copper, 204 F.3d at 156 ("The injury in fact requirement . . . blocks suit by those whose allegations of injury are based on mere conjecture rather than an actual or threatened invasion of their . . . interests.").

     The SEP Policy's nexus-oriented approach makes clear that a variety of non-price factors are also relevant to a SEP's nexus and, in turn, the benefits a SEP provides to an affected

community.  See SEP Policy at 7-8, 20-21, 24.  In fact, the SEP
Policy explicitly forbids cost from being the sole consideration
for a SEP.  See id. at 8.  Indeed, in this case, Mary Hunt
determined that the nexus of the two replacement SEPs is greater
than the west sump SEP's to the extent that the two replacement
SEPs mitigate more of Bayer's civil penalty.  (2017 Hunt Decl. ¶
35.)[8]

    The west sump SEP illustrates the weakness of Citizen
Plaintiffs' dollar-for-dollar theory of injury.  Bayer
apparently achieved the benefit of the $3.1 million west sump
SEP – combating water pollution by preventing overflows into the
Kanawha River – by theretofore spending a relatively modest $800
thousand on independent projects.  (See Hunt Decl. ¶ 29.)  Thus,
the court need not look further than the uncontroverted
circumstances of this case to understand that benefit and SEP
cost cannot be equated.  The correlation between benefit and SEP
price is at the very least unpredictable to the point that the
two cannot be linked without justification.

---

[8] The court, however, hesitates in exploring this point because
any comparison of nexus at this stage of the proceedings risks
impermissibly confusing the merits of the proposed modification
with standing.  Ariz. State Legis. v. Ariz. Indep. Redistricting
Comm'n, 135 S. Ct. 2652, 2663 (2015) (quoting Davis v. United
States, 564 U.S. 229, 249 n.10 (2011)).

As earlier noted, beyond drawing the court's attention to price, Citizen Plaintiffs do not provide any further link between the proposed modification and the local intervenors' alleged injury.  Of course, SEP spending on top of the two replacement SEPs would presumably provide heightened benefits to the local intervenors.  And as a general matter more expensive SEPs have a greater likelihood of providing more benefit to an affected community.  The injury here, however, is not one of lost dollars but of lost benefits.  As explained above, the two are not congruent like Citizen Plaintiffs baldly suggest.  Thus, having otherwise not described how the local intervenors will lose environmental and health benefits, Citizen Plaintiffs' theory of harm is pure conjecture or hypothesis.

Citizen Plaintiffs also have failed to show that the second alleged injury would likely be redressed by a favorable decision.  It is apparent that the independent west sump projects have already achieved the pollution prevention goals of the west sump SEP.  (See 2017 Stewart Decl. ¶¶ 10-11, 15.)  If the proposed modification is rejected as Citizen Plaintiffs ask, Citizen Plaintiffs would be left with Bayer's obligation to complete the virtually useless west sump SEP.  In that case, the local intervenors would experience very little to no environmental or health benefits.

Accordingly, under the circumstances presented here, Citizen Plaintiffs lack Article III standing to intervene in this matter as of right.

B. Permissive Intervention, Status as Amici Curiae, and Hearing on the Proposed Modification

Having decided that "intervention as of right is not warranted, a court may still allow an applicant to intervene permissively under Rule 24(b)." Stuart v. Huff, 706 F.3d 345, 349 (4th Cir. 2013). But a permissive intervenor must have Article III standing when the intervenor does not join the side of an existing party with standing. See Shaw v. Hunt, 154 F.3d 161, 165 (4th Cir. 1998). Accordingly, Citizen Plaintiffs cannot permissively intervene here. Citizen Plaintiffs do not seek to join an existing side of the case, and the court has already established that they lack standing to pursue their requested relief.

It is worth noting that this court has previously stated that "Shaw does not constitute a definitive analysis on the point" of a permissive intervenor's need to show standing. United States v. Arch Coal, Inc., No. 2:11-cv-00133, 2011 U.S. Dist. LEXIS 66789, at *19 n.4 (S.D. W. Va. June 22, 2011) (Copenhaver, J.). This court felt that way likely because the

26

Fourth Circuit in Shaw did not directly explore the scenario
presented here, where a would-be permissive intervenor seeks
relief in opposition of the existing parties.  See Shaw, 154
F.3d at 162-65.  Instead, the court in Shaw confronted "the
typical permissive-intervention case, [in which] a third party
wants to join a lawsuit to advocate for the same outcome as one
of the existing parties."  Bond v. Utreras, 585 F.3d 1061, 1070
(7th Cir. 2009).  Such an intervenor is shielded from a standing
inquiry according to the longstanding principle that only one
plaintiff is required to show standing to seek a requested form
of relief.  Id. (citing Vill. of Arlington Heights v. Metro.
House. Dev. Corp., 429 U.S. 252, 264 (1977)).  As earlier noted,
the Supreme Court expanded on that principle in Town of Chester,
explaining that "[f]or all relief sought, there must be a
litigant with standing, whether that litigant joins the lawsuit
as a plaintiff, a coplaintiff, or an intervenor of right."  137
S. Ct. at 1651.  In view of Shaw and Town of Chester, this court
is confident that the same principle extends to a permissive
intervenor.

As an alternative to intervention, Citizen Plaintiffs
ask to participate as amici.  (Mem. Supp. 13; Reply Supp. 17-
18.)  The Fourth Circuit instructs "that allowing a proposed
intervenor to file an amicus brief is an adequate alternative to

27

permissive intervention." <u>McHenry v. Comm'r of Internal Revenue</u>, 677 F.3d 214, 227 (4th Cir. 2012); <u>see also</u> <u>Stuart v. Huff</u>, 706 F.3d 345, 355 (4th Cir. 2013) (stating that amicus status is an alternative to intervention).  A court's decision to allow an amicus brief is discretionary by extension.  <u>See</u> <u>Ohio Valley Envtl. Coalition v. McCarthy</u>, 313 F.R.D. 10, 32 (S.D. W. Va. 2015); <u>cf.</u> Fed. R. Civ. P. 24(b)(3) (granting a court discretion when considering permissive intervention); <u>In re Sierra Club</u>, 945 F.2d 776, 779 (4th Cir. 1991) (reviewing the denial of a motion for permissive intervention for abuse of discretion).

The United States does not oppose Citizen Plaintiffs' request, (U.S. Resp. 15), but Bayer does, (<u>see</u> Bayer Resp. 18-19).  Bayer argues that Citizen Plaintiffs fail to show how their relative perspective on the deterrent effect of the consent decree would differ from that of the United States and that Citizen Plaintiffs have already had the opportunity to comment on the proposed modification during the public comment period.  (<u>Id.</u> 18.)  Nevertheless, the court believes that Citizen Plaintiffs' participation as amici will help sharpen the issues for review.  The court will consider Citizen Plaintiffs' amicus brief, already filed on the court's docket.  (<u>See</u> ECF #41.)

Last, Citizen Plaintiffs seek a hearing on the fairness of the proposed modification.  (Mem. Sup. 21-22; Reply Supp. 17.)  The court is unprepared to make that decision at this time.  The court may decide that the memoranda adequately present the issues and make its decision accordingly.  If the need for further explanation arises, the court in a later order will direct the United States and Bayer to appear for a hearing, and notify Citizen Plaintiffs that they may attend.

### III. Conclusion

For the foregoing reasons, it is ORDERED that Citizen Plaintiffs' motion to intervene be, and hereby is, denied. Citizen Plaintiffs' brief, docket entry number forty-one, will nonetheless be considered as an amicus submission.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER: July 24, 2018

John T. Copenhaver, Jr.
United States District Judge

29