UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                    Civil Action No. 2:15-cv-13331

BAYER CROPSCIENCE LP,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending is plaintiff United States of America's motion, filed December 6, 2017, to enter the Second Modification of Consent Decree.

       Contemporaneous with the entry of this order, the court denied the motion to intervene filed by proposed intervenors Citizen Plaintiffs (Pamela L. Nixon; Kathy Ferguson; People Concerned About Chemical Safety, Inc. ("PCACS"); and Natural Resources Defense Council, Inc. ("NRDC")).  The court nonetheless decided to grant Citizen Plaintiffs amici status, and the court has considered Citizen Plaintiffs' brief filed in opposition to the pending motion as set forth more fully herein.

I. Background

       On August 28, 2008, a runaway chemical reaction occurred inside a pressurized vessel at a chemical plant in

Institute, West Virginia (the "Institute Plant"), owned and operated at the time by defendant Bayer CropScience LP ("Bayer").[1] (2015 Hunt Decl. ¶ 9; Daniel Decl. ¶ 8; Shabazz Decl. ¶ 7.) The vessel was located in the Methomyl unit of the Institute Plant. (2015 Hunt Decl. ¶ 9.) Methomyl is a pesticide used in a process to make Larvin, the finished product, which is also a pesticide. (Id. ¶¶ 9, 25.). The vessel exploded, spraying and igniting about 2,500 gallons of its highly flammable contents and causing a fire that lasted more than four hours. (E.g. 2015 Hunt Decl. ¶ 8.) The explosion killed two Bayer employees, and over 40,000 area residents were ordered to shelter in place for more than three hours. (Id. ¶ 8; Daniel Decl. ¶ 8; Shabazz Decl. ¶ 7.)

At the time of the explosion, Bayer processed several chemical compounds at the Institute Plant classified as "extremely hazardous substances" under Section 112(r) of the Clean Air Act, 42 U.S.C. § 7412 (2016).[2] (See Daniel Decl. ¶ 9; Shabazz Decl. ¶ 9.) Congress enacted Section 112(r) in an

---

[1] This background heavily draws from the court's order regarding Citizen Plaintiffs' motion to intervene because the circumstances surrounding each order are virtually identical.

[2] In particular, debris hurled from the exploding vessel struck the ballistic shield of a tank containing methyl isocyanate - the chemical compound central to the 1984 explosion in Bhopal, India - but did not damage the tank itself. (2015 Hunt Decl. ¶ 9; Nixon Decl. ¶ 3.)

effort "to reduce hazardous air pollutants."  Sierra Club v. EPA, 863 F.3d 834, 835 (D.C. Cir. 2017).  Specifically, the objective of Section 112(r) is "to prevent the accidental release and to minimize the consequences of any such release of any . . . extremely hazardous substance."  42 U.S.C. § 7412(r)(1).  An "extremely hazardous substance" is one "known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment."  Id. § 7412(r)(3).  Since the explosion, Bayer has limited its Institute Plant operations to the production of Larvin, which evidently does not require the use of any chemicals considered an extremely hazardous substance.  (See Daniel Decl. ¶¶ 13-16.) Methomyl, now purchased from another source rather than produced on-site, is not an extremely hazardous substance.  (See id. ¶ 16.)[3]

     In a January 2011 report relating to the 2008 explosion, the investigation team for the United States Chemical Safety and Hazard Investigation Board ("CSB") - tasked with,

_____

[3] Methomyl is still present on-site and is flammable.  (Id.) Thus, the Institute Plant remains subject to the "general duty" clause of Section 112(r), which requires Bayer "to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur."  42 U.S.C. § 7412(r)(1).

inter alia, investigating industrial chemical accidents involving extremely hazardous substances, 42 U.S.C. § 7412(r)(6) - "determined that the runaway chemical reaction and loss of containment of the flammable and toxic chemicals resulted from deviation from the written start-up procedures, including bypassing critical safety devices intended to prevent such a condition." (Wang Decl., Attach. 4, CSB Investigation Report at 1.)[4]  Other governmental agencies also investigated the explosion, including the Environmental Protection Agency ("EPA"), (e.g., 2017 Hunt Decl. ¶ 7), most prominent here because it is tasked with regulating under Section 112 as well as general enforcement of the Clean Air Act, see 42 U.S.C. §§ 7412(r)(7), 7413(b).

On September 21, 2015, at the request of the EPA, the United States filed in this court a complaint against Bayer, alleging violations of Section 112(r) at the Institute Plant. (Compl. at 1, ¶ 1; see also 2015 Hunt Decl. ¶¶ 18-19 (stating that EPA concluded Bayer violated Section 112(r) and recommended

---

[4] Although the conclusions of the CSB investigation report cannot "be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report," 42 U.S.C. § 7412(r)(6)(G), the CSB's determination is noted here simply as background material.  Indeed, Bayer denies liability in the consent decree, which was entered as final judgment of the matter as to the United States and Bayer.  (Consent Decree at Recitals, ¶ 93.)

civil action).) On August 9, 2016, this court approved a
consent decree between the United States and Bayer. (See ECF
#18 (memorandum opinion and order); ECF #19 ("Consent Decree").)
The consent decree obligated Bayer to pay $975,000 as a civil
penalty, submit to specified injunctive relief, and carry out
various supplemental environmental projects ("SEP") at an
ultimate estimated cost of $4.4 million, of which $3.1 million
was estimated for the "west sump" project. (See generally
Consent Decree.)[5] The remaining $1.3 million consists primarily
of equipment and training for first responders in nearby
affected cities and the rest for shelter-in-place training,
including students at schools. The total is nearly $5.4
million.

    The decision to include SEPs in the settlement of an
enforcement action is within the prosecutorial discretion of the
EPA. (See Wang Decl., Attach. 3, U.S. EPA, Supplemental
Environmental Projects Policy (2015 Update) ("SEP Policy") at 2,
7, 7 n.8, 24 (footnote omitted).) As explained by the EPA's SEP
Policy, a SEP is

> an environmentally beneficial project or activity that
> is not required by law, but that a defendant agrees to
> undertake as part of the settlement of an enforcement

_____

[5] A "sump" is "a pit or reservoir serving as a drain or
receptacle for liquids[,] such as . . . a pit at the lowest
point in a circulating or drainage system." Sump, Merriam-
Webster (2018), https://www.merriam-webster.com/dictionary/sump.

> action.  SEPs are projects or activities that go
> beyond what could legally be required in order for the
> defendant to return to compliance, and secure
> environmental and/or public health benefits in
> addition to those achieved by compliance with
> applicable laws.

Id. at 1 (footnote omitted).  "The primary purpose of the SEP

Policy is to encourage and obtain environmental and public

health protection and benefits that may not otherwise have

occurred in the settlement of an enforcement action."  Id.  Any

SEP must have a "sufficient nexus" to the underlying violations

of environmental law, which, generally speaking, means that

there must be a "relationship between the violation and the

proposed [SEP]."  See SEP Policy at 7-8; (2017 Hunt Decl. ¶ 11).

A sufficient nexus "is easier to establish if the primary impact

of the project is at the site where the alleged violation

occurred, at a different site in the same ecosystem, or within

the immediate geographic area."  SEP Policy at 8.

"A primary incentive for a defendant to propose a SEP

is the potential mitigation of its civil penalty."  Id. at 21.

A defendant may subtract up to 80% of the cost to implement a

SEP from its total civil penalty.  See id. at 24; (2017 Hunt

Decl. ¶ 14).  Thus, a defendant that agrees to complete a SEP

will pay a lower civil penalty than the defendant otherwise

would have without a SEP.  (See SEP Policy at 21.)  While

mitigation is determined on a case-by-case basis, a SEP that

better achieves the EPA's criteria generally results in a greater mitigation.  See id. at 20; (2017 Hunt Decl. ¶ 13).

Of particular relevance here, Bayer agreed to a SEP under which it would expand the "west sump" of the Institute Plant to "provide additional storage capacity to prevent untreated process wastewater from overflowing into the Kanawha River during heavy rain events, fire-fighting emergencies, and process upsets." (Consent Decree ¶ VII.23.a; see generally id. App. B.)  The cost of the expanded west sump SEP was estimated to be $3.1 million.  (Id. ¶ VII.25.a.i.)

Prior to agreeing to the expanded west sump SEP, Bayer had begun implementing in November 2012 "a series of projects [independent of the SEP] to reduce the likelihood of overflows from the West Sump" at a cost of $800 thousand.  (2017 Stewart Decl. ¶ 10.)  Because of those projects, the west sump has not had an overflow since August 30, 2013.  (See id. ¶¶ 11, 15.) Additionally, while excavating for the west sump SEP, Bayer encountered subsurface conditions, including harmful soil contaminants, that increased the cost of the SEP and exposed Bayer's workers to health risks.  (Id. ¶ 14; 2017 Hunt Decl. ¶¶ 25-26.)  For these reasons, Bayer, the Department of Justice, and the EPA decided to halt construction of the west sump SEP. (2017 Stewart Decl. ¶ 15; 2017 Hunt Decl. ¶¶ 27, 30.)  Bayer had

spent about $2.2 million of the $3.1 million on the SEP up to that point.  (2017 Stewart Decl. ¶ 13; 2017 Hunt Decl. ¶ 30.)

Bayer then proposed a series of SEPs to replace the west sump SEP.  (2017 Hunt Decl. ¶ 31; see also 2017 Stewart Decl. ¶ 17.)  Mary A. Hunt, a Risk Management Program Coordinator for the EPA, is "the lead technical member of the [Clean Air Act] team for the judicial enforcement action" against Bayer.  (2017 Hunt Decl. ¶¶ 1, 3, 7.)  She has served in that role since the original investigation and enforcement action against Bayer that culminated in the consent decree. (Id. ¶ 7; 2015 Hunt Decl. ¶ 7.)  Her job duties include "analyzing [SEPs]," "evaluat[ing] proposed SEPs to determine benefit to public health and the environment in accordance with EPA's SEP Policy," and "develop[ing] penalty calculations using the applicable EPA penalty policy."  (2017 Hunt Decl. ¶ 5.) Ultimately, after Hunt's evaluation, Bayer and the EPA agreed to two SEPs, one for each of two fire departments.  The two SEPs would require Bayer to purchase new fire trucks, "specialized equipment for chemical-firefighting," and other equipment for the Jefferson Volunteer Fire Department and the Institute Volunteer Fire Department.  (2017 Stewart Decl. ¶ 18; 2017 Hunt Decl. ¶ 32.)

The two replacement SEPs cost around $1.7 million,
(2017 Stewart Decl. ¶ 18; 2017 Hunt Decl. ¶ 34), which is $1.4
million less than the $3.1 million cost of the west sump SEP if
one disregards the $2.2 million spent by Bayer on the now
abandoned west sump SEP. Nevertheless, the EPA determined that
"the mitigation percentage of the [two] proposed replacement
SEPs is higher than the percentage for the West Sump Expansion"
to such a degree that, consequently, "the penalty mitigation
amount [for the two replacement SEPs] is also slightly higher
than the penalty mitigation amount for the West Sump Expansion
SEP." (2017 Hunt Decl. ¶ 35.) The EPA concluded that "[t]he
[two replacement] SEPs satisfy all of the EPA procedures,
settlement requirements and other criteria." (Id. ¶ 39.) The
actual mitigation percentages are not given.

The United States and Bayer memorialized their
agreement in the Second Modification of Consent Decree (the
"proposed modification"), lodged in this court on August 31,
2017. (See ECF #25; id. Attach. 1 ("Proposed Modification").)
On September 12, 2017, the United States published in the
Federal Register the notice of lodging the proposed
modification. The notice provided that "[a]ll comments must be
submitted no later than thirty (30) days after the publication
date of this notice." 82 Fed. Reg. 42838 (Sept. 12, 2017).

9

Three comments were received, one each from Jane
Gilbert; Pamela Nixon and Vivian Wang on behalf of PCACS, the
NRDC, and the NAACP; and Marie Oxley, widow of one of the Bayer
employees killed by the 2008 explosion.  (See Mot. to Enter
Proposed Modification, Exs. 1-3.)  The EPA concluded as follows
at the close of its review:

> After careful review of the comments received during
> the public comment period for the [proposed
> modification], [the] EPA has determined that the
> proposed [modification] to the Consent Decree is fair
> and reasonable because it includes replacement SEPs
> that enable local volunteer emergency responders to
> address accidental chemical releases and increase the
> responsiveness of the nearby emergency response
> entities to those chemical releases which do occur and
> the penalty mitigation amount applied to the
> replacement SEPs is consistent with the public health
> and environmental benefits the community provided.

(2017 Hunt Decl. ¶ 40.)[6]

On December 6, 2017, the United States filed the
pending motion, with which Bayer has joined.  The United States
and Bayer seek the entry of the proposed modification with the
court's approval.  (U.S. Mem. Supp. 19; Bayer Mem. Supp. 20.)
Pursuant to the consent decree, any "modification [that]
constitutes a material change to th[e Consent] Decree" requires

---

[6] On April 2, 2018, Bayer notified the court via letter that it
must re-file bids on the equipment required by the replacement
SEPs.  (See ECF #47.)  Although new regulatory requirements have
slightly driven up the cost of the firefighting equipment and
fire trucks, Bayer conveys its and the fire department's
continued desire to perform the replacement SEPs.  (Id. at 2.)

"approval by the Court."  (Consent Decree ¶ 84.)  "Although
[Bayer] has expended approximately [$2.2 million] on the
[expanded west sump] SEP, in proposing the substitute SEPs . . .
, [Bayer] does not seek and does not expect to receive any
credit for these costs."  (2017 Stewart Decl. ¶ 20.)

As earlier noted, Citizen Plaintiffs filed a brief in
opposition to the proposed modification.  (See generally Mem. in
Opp'n.)  Citizen Plaintiffs request a hearing to assess the
fairness of the proposed modification.  (Mem. in Supp. Intervene
21-22.)  Ultimately, Citizen Plaintiffs ask the court to reject
the proposed modification and require the United States and
Bayer to renegotiate a modification of the consent decree, with
the community's input, that includes SEPs that restore the value
to the community that the west sump SEP would have provided.
(Mem. in Opp'n 15-16; Mem. in Supp. Intervene 21.)

## II. Governing Standard

At the outset, the United States and Citizen
Plaintiffs debate the proper standard for evaluation of the
proposed modification.  Citizen Plaintiffs contend that the
court should apply the standard described by the Supreme Court
of the United States in Rufo v. Inmates of Suffolk County Jail,
502 U.S. 367 (1992).  (See Mem. Supp. Intervene 15-16; Mem. in

Opp'n 4-6.)   In Rufo, the Supreme Court set forth the standard
by which courts are to evaluate a party's request to modify a
consent decree.   See 502 U.S. at 383.

The United States argues that Rufo is nonetheless
inapplicable here because it "entailed different circumstances."
(See U.S. Reply 3-5; see also U.S. Mem. Supp. 9-10.)   The United
States attempts to distinguish Rufo by noting that only "one
party was seeking to modify a consent decree" in that case "over
the objection of the opposing party," whereas here the United
States and Bayer seek to modify the consent decree pursuant to
paragraph eighty-four of the decree, noted above ("a material
change . . . requires approval by the Court").   (U.S. Reply 3;
see also U.S. Mem. Supp. 9.)   The United States insists that
"modifications that are made pursuant to this paragraph by
written agreement invoke the authority of the Consent Decree
itself . . . , not the authority of the Court pursuant to [Fed.
R. Civ. P.] 60."   (U.S. Reply 4; see also U.S. Mem. Supp. 9-10.)
In this manner, the United States believes that the proposed
modification should be evaluated under the same standard as that
for approval of a consent decree.   (Mem. Supp. 9.)

The United States' argument is of little merit.
Concededly, the Supreme Court in Rufo explained that "[a]
consent decree no doubt embodies an agreement of the parties and

12

thus in some respects is contractual in nature." 502 U.S. at 378; see also Pigford v. Veneman, 292 F.3d 918, 923 (D.C. Cir. 2002) ("[A] consent decree[ has] a hybrid character, having qualities of both contracts and court orders."). But the Supreme Court elaborated that a consent decree "is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." Id. (citing Sys. Fed'n No. 91 Ry. Emp's. Dep't v. Wright, 364 U.S. 642, 650-51 (1961)); see also Thompson v. United States HUD, 404 F.3d 821, 832 n.6 (4th Cir. 2005) ("Issues of interpretation and enforcement of a consent decree typically are subject to traditional rules of contract interpretation, and the district court's authority is thus constrained by the language of the decree.  A court's inherent power to modify a consent decree, however, is not circumscribed by the language of the decree." (citations omitted and emphasis in original)).  Thus, the Supreme Court in Rufo reiterated the longstanding principle that modifications of a consent decree are subject to Federal Rule of Civil Procedure 60(b), which governs the grounds for relief from final judgments and orders.  Id.; cf. United States v. Chevron U.S.A. Inc., 380 F. Supp. 2d 1104, 1120-21 (N.D. Cal. 2005) (approving a modified consent decree that allowed the parties to agree to non-material modifications because such modifications

would nonetheless be filed with the court and subject to judicial oversight).

Citizen Plaintiffs also point out that at least one circuit court "ha[s] applied <u>Rufo</u> to joint proposals to modify a decree." (Mem. in Opp'n 5-6 (citing <u>League of United Latin Am. Citizens v. City of Boerne</u>, 659 F.3d 421, 437 (5th Cir. 2011).) The United States counters that "there is no indication in <u>City of Boerne</u> that the consent decree contained modification provisions like those in . . . the instant Consent Decree." (U.S. Reply 4.)  Most likely, the Fifth Circuit did not address the applicability of <u>Rufo</u> because it, like this court, considered the issue uncontroversial.  Accordingly, the court will evaluate the proposed modification pursuant to Rule 60(b) and its interpreting case law.[7]

Specifically, this case falls under Rule 60(b)(5), which provides the following, in pertinent part:

> On motion and just terms, the court may relieve a
> party or its legal representative from a final
> judgment, order, or proceeding . . . [when] applying
> it prospectively is no longer equitable.

---

[7] The United States maintains that the proposed modification passes muster under Rule 60(b) and <u>Rufo</u> anyway.  (U.S. Mem. Supp. 10.)  Bayer similarly claims that the proposed modification is proper and equitable under either the Rule 60(b) and <u>Rufo</u> standard or the consent decree standard.  (<u>See</u> Bayer Mem. Supp. 12.)

Fed. R. Civ. P. 60(b)(5).  "A court's ability to modify a consent decree or other injunction springs from the court's inherent equitable power over its own judgments."  Thompson, 404 F.3d at 830 (citing, inter alia, United States v. City of Miami, 2 F.3d 1497, 1509 (11th Cir. 1993), and SEC v. Worthen, 98 F.3d 480, 482 (9th Cir. 1996)).  "The hallmark of equity, of course, is its flexibility . . . ."  Id. (citing Freeman v. Pitts, 503 U.S. 467, 487 (1992), and Brown v. Bd. of Educ., 349 U.S. 294, 300 (1955)).

The Rufo standard by which the proposed modification must be judged is as follows:

> [A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.  If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance.

502 U.S. at 383; see also Thompson, 404 F.3d at 827.  The burden of proof is on the party seeking the modification.  See Rufo, 502 U.S. at 393; Horne v. Flores, 557 U.S. 433, 447 (2009).

III. Discussion


A. Significant Change in Circumstances


In Thompson, the Fourth Circuit elaborated on the
first prong of the Rufo standard:

> A "significant change either in factual conditions or
> in law" can support a requested modification.  A
> significant change in the factual conditions can
> support a modification [1] if the changed conditions
> "make compliance with the decree substantially more
> onerous," [2] if the decree "proves to be unworkable
> because of unforeseen obstacles," or [3] if
> "enforcement of the decree without the modification
> would be detrimental to the public interest."
> "Ordinarily, however, modification should not be
> granted where a party relies upon events that actually
> were anticipated at the time it entered into a
> decree."

404 F.3d at 827 (citations omitted) (quoting Rufo, 502 U.S. at
384-85).


The United States and Bayer proffer the reasons that
led them to agree to halt construction of the west sump SEP as
unforeseen obstacles that have rendered the SEP unworkable.
(See U.S. Mem. Supp. 10; Bayer Mem. Supp. 7, 15, 18-19.)  They
recount that Bayer uncovered unanticipated obstacles that
"presented a health and safety risk to construction workers and
resulted in an increase in costs to complete the [west sump]
SEP." (2017 Stewart Decl. ¶ 14; 2017 Hunt Decl. ¶ 26.)  Most
prominently, Bayer's "workers encountered contaminants in

16

excavated soils" that "presented health and safety risks to the
workers." (2017 Hunt Decl. ¶ 26.) These factors, coupled with
the success of the independent west sump projects (the projects
beginning in November 2012 at a cost of $800 thousand), led the
United States and Bayer to agree that construction of the west
sump SEP should stop. (2017 Hunt Decl. ¶ 30.) In light of the
judgment of the United States and Bayer, the court is satisfied
that these obstacles were unforeseen and rendered the west sump
SEP unworkable.

Further, in the court's view, the success of the
independent west sump projects alone is also important here.
The west sump has not had an overflow since August 2013 as a
result of those projects, despite "the Charleston, West
Virginia, area experienc[ing] at least one 100-year rain event"
during that time. (2017 Stewart Decl. ¶ 11; see also 2017 Hunt
Decl. ¶ 29.) It is undisputed that, as a result, "completion of
the [west sump] SEP would not significantly improve
environmental protection." (2017 Stewart Decl. ¶ 15; see also
2017 Hunt Decl. ¶ 29.) In other words, the west sump SEP would
be fruitless, and a modification of the consent decree suitably
tailored to that end would provide a benefit for the public
where there otherwise would be very little to none. Cf. Duran
v. Elrod, 760 F.2d 756, 759 (7th Cir. 1985) (cited by Rufo)

17

("When an equity decree affects other people besides the parties to it, the judge must take account of the interest of those people - the public interest - in his decision whether to grant or deny equitable relief.  This [remains] true whether the judge is being asked to . . . modify a decree." (citations omitted)); SEP Policy at 1 ("SEPs are projects or activities that . . . secure environmental and/or public health benefits in addition to those achieved by compliance with applicable laws.") Accordingly, the United States and Bayer have demonstrated that enforcement of the consent decree without the proposed modification would be detrimental to the public interest.

"Citizen Plaintiffs urge the Court not to approve any modification without scrutinizing whether" the subsurface and soil conditions and the ultimate fruitlessness of the west sump SEP were actually unanticipated when the United States and Bayer entered into the consent decree.  (See Mem. in Opp'n 7.) Citizen Plaintiffs point out that the EPA approved the west sump SEP around September 2014 and that the court entered the consent decree in August 2016.  (Id. 7-8.)  Meanwhile, Bayer had begun working on the independent west sump projects in late 2012, and there had not been an overflow from the west sump since August 2013.  (Id. (citing, inter alia, 2017 Stewart Decl. ¶¶ 9-11).) Additionally, Citizen Plaintiffs note that the Institute Plant

was already the subject of a corrective action for soil
contamination under the Resource Conservation and Recovery Act.
(Id. 8 (citing, inter alia, 2017 Hunt Decl. ¶ 28).)  Thus,
Citizen Plaintiffs claim that the timeline of events suggests
that the United States and Bayer may have known that the west
sump SEP would wind up unworkable or fruitless.

          The United States and Bayer highlight the speciousness
of that position.  (See U.S. Reply 1-3; Bayer Reply 3-5.)  They
emphasize that Bayer surely would not have spent $2.2 million on
a project - and not seek credit against their civil penalty - if
Bayer knew that the west sump SEP was doomed to fail all along.
(See U.S. Reply 2; Bayer Reply 3-4.)  The United States and
Bayer further note that the United States similarly would not
have approved a SEP that it knew would serve no purpose and
yield no benefit.  (U.S. Reply 2; Bayer Reply 5); see Thompson,
404 F.3d at 828-29 ("If the parties had actually anticipated
that the Local Defendants [local housing authority and
officials] would be so far behind on their obligations at this
stage in the proceedings, the Consent Decree would never have
been executed.  The Plaintiffs would not have given up their
claims in exchange for an agreement that they anticipated would
not be followed, and the Local Defendants would not have
subjected themselves to the district court's contempt powers by

agreeing to do something they knew they would not be able to do.").  In short, the request to modify the consent decree in this case cannot reasonably be deemed the "bait and switch" that Citizen Plaintiffs suggest.

The court concludes that the United States and Bayer have carried their burden to show a significant change in factual conditions that supports modification of the consent decree.

B. Suitably Tailored to the Changed Circumstances

A court's review of the second prong of the <u>Rufo</u> standard should center "on whether the proposed modification is tailored to resolve the problems created by the change in circumstances.  A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires."  <u>Rufo</u>, 502 U.S. at 391.  "[G]enerally speaking, a district court modifying a consent decree should strive to 'preserve the essence of the parties' bargain.'" <u>Thompson</u>, 404 F.3d at 833 (quoting <u>Pigford</u>, 292 F.3d at 926); <u>see also</u> <u>Vanguards of Cleveland v. City of Cleveland</u>, 23 F.3d 1013, 1020 (6th Cir. 1994); <u>cf.</u> <u>N.Y. Ass'n for Retarded Children v. Carey</u>, 706 F.2d 956, 969 (2d Cir. 1983) (allowing a "modification [that] was essential to attaining th[e] goal at

any reasonably early date"). As a reminder, the court's inquiry stems from its flexible equitable authority. See id. at 830.

The problem created by the changed circumstances is that the west sump SEP is now seen to be impractical, both in its feasibility and its usefulness. A modification replacing the west sump SEP is thus a sensible solution. Whether the proposed modification is a suitably tailored solution is the focus of the court's analysis. For reasons explained below, the court concludes that the proposed modification is suitably tailored to solve the problem posed by the west sump SEP and thus satisfies the second prong of the Rufo standard.

First, the proposed modification does not sacrifice water quality. The west sump SEP sought "to prevent untreated process wastewater from overflowing into the Kanawha River." (Consent Decree ¶ 23.a.) That goal appears to have been achieved independently of the expanded west sump. Consequently, to the extent that water pollution from the west sump overflows into the Kanawha River formed part of the "essence of the parties' bargain," Thompson, 404 F.3d at 833, the proposed modification need not address it because the overflows have already apparently been curbed.

Second, the proposed modification restores the overarching goals that the government seeks to secure through

21

SEPs.  As earlier described, "[t]he primary purpose of the SEP

Policy is to encourage and obtain environmental and public

health protection and benefits that may not otherwise have

occurred in the settlement of an enforcement action."  SEP

Policy at 1.

To ensure that purpose is met, SEPs "must have [a]

sufficient nexus," which contemplates "the relationship between

the violation and the proposed project."  Id. at 7 (emphasis

omitted).  The SEP policy further explains that a nexus is

established by showing a relationship to the underlying alleged

statutory violations and to the surrounding communities:

> [A SEP] must demonstrate that it is designed to
> reduce[] [A] [t]he likelihood that similar violations
> will occur in the future; [B] [t]he adverse impact to
> public health and/or the environment to which the
> violation at issue contributes; or [C] [t]he overall
> risk to public health and/or the environment
> potentially affected by the violation at issue.

Id. at 8.  The policy adds, as noted earlier, that "[n]exus is

easier to establish if the primary impact of the project is at

the site where the alleged violation occurred, at a different

site in the same ecosystem, or within the immediate geographic

area."  Id.  "The immediate geographic area will generally be

the area within a 50-mile radius of the site on which the

violations occurred."  Id. at 8 n.9.  The evaluation of nexus is

guided by the following factors, with a SEP that performs more

strongly receiving a higher mitigation credit against an imposed civil penalty: "Significant, Quantifiable Benefits to Public Health and/or the Environment;" "Environmental Justice;" "Community Input;" "Innovation;" "Multimedia Impacts;" and "Pollution Prevention." Id. at 20-21.

As earlier noted, Mary A. Hunt has served as the EPA's lead technical member of this action since the original investigation and enforcement action. (See id. ¶¶ 1, 3, 7.) Hunt recounts that after the United States and Bayer agreed to halt construction of the west sump SEP, the "EPA rejected many of [Bayer's] SEP proposals as being inconsistent with the SEP Policy because they lacked sufficient nexus to the alleged underlying [Clean Air Act] violations." (Id. ¶ 31.) Hunt and the EPA ultimately determined that the two replacement SEPs - the purchase of equipment for two local fire departments - satisfied the SEP Policy. (See id. ¶ 33.) The two replacement SEPs cost $1.7 million compared to the west sump SEP's $3.1 million. (See id. ¶ 34.)

Importantly, Hunt concluded as follows, in relevant part:

> The proposed replacement SEPs met the evaluation
> criteria for: (1) Significant, Quantifiable Benefits
> to Public Health and/or the Environment, because the
> SEPs improve the response capability of the response
> agencies tasked with responding to chemical releases

> in the vicinity of the Institute [Plant]; (2)
> Environmental Justice, because the SEPs benefit the
> surrounding community, which is located in an
> environmental justice area; and (3) Community Input,
> because the SEPs were selected after receiving input
> as to response needs from local emergency responders.
> Because the emergency response equipment allows
> responders to address releases to the air, the
> proposed replacement SEPs also have a closer nexus to
> the underlying [Clean Air Act] Section 112(r)
> violations than the [west sump] SEP . . . .

(Id. ¶ 33.)  Hunt also determined that the two replacement SEPs

should have the same mitigation percentage that she previously

assigned to the equipment purchase SEPs under the consent decree

in 2015.  (Id.)  As earlier noted, and as Citizen Plaintiffs

stress, she does not give the actual percentage values of the

SEPs nor her underlying calculations.  (Mem. in Opp'n 12.)

Instead, Hunt compares the mitigation percentages in relative

terms, stating that the mitigation percentage of the two

replacement SEPs is "higher than the percentage for the [west

sump SEP]" to such an extent that the resulting mitigation

amount in dollars is greater than that of the west sump SEP.

(Id. ¶ 35.)

These circumstances indicate that the two replacement

SEPs preserve the purpose of the SEP Policy and, further, that

the United States and Bayer engaged in a fair process in

replacing the west sump SEP.  The court sees no reason to reject

Hunt's evaluation or conclusions.  She evaluated Bayer's

proposed SEPs in 2015 when the United States and Bayer lodged
the consent decree and in 2017 when they lodged the proposed
modification.  She provided an adequate analysis of the
circumstances and of her decision-making.  In both instances,
she applied a consistent mitigation percentage to equipment
purchase SEPs of similar character.  Critically, the nexus of
the two replacement SEPs is stronger than the west sump SEP's to
such a degree that $1.7 million mitigates more of Bayer's civil
penalty than $3.1 million.  Nevertheless, the proposed
modification does not reduce Bayer's civil penalty.  Thus, the
court finds that the proposed modification successfully
approximates the goals that the United States and Bayer sought
to achieve when they agreed to the west sump SEP.

        Citizen Plaintiffs disagree that the replacement SEPs
are suitably tailored to provide the same amount of
environmental and health benefits as would have been provided by
the west sump SEP.  (Mem. in Opp'n 14.)  They insist that "an
appropriate modification would require Bayer to fund an
additional SEP or SEPs valued at $1.[4] million," being the
monetary difference between the west sump SEP ($3.1 million) and
the two replacement SEPs ($1.7 million).  (Id.; see also id. 10-
12, 14-15; Mem. in Supp. Intervene 20.)  The United States and
Bayer correctly note, however, that the intrinsic value of SEPs

to the community depends on a variety of factors other than simply price.  <u>See</u> SEP Policy at 20-21; (U.S. Reply 6; Bayer Reply 5).  Indeed, the SEP Policy specifically prohibits price from being the sole factor in consideration of proposed SEPs. <u>See</u> SEP Policy at 8.  SEPs are instead valued primarily according to nexus, which is represented by penalty mitigation percentage and amount.  <u>See</u> <u>id.</u> 20, 24.[8]  As noted, the EPA and Hunt determined that the two replacement SEPs exceed the west sump SEP in both respects.

Citizen Plaintiffs also assert that the United States and Bayer fail to explain why the cheaper replacement SEPs provide a benefit comparable to that of the west sump SEP. (Mem. in Opp'n 12; Mem. in Supp. Intervene 19.)  In particular, Citizen Plaintiffs claim that Hunt does not explain how she arrived at the mitigation percentage for the two replacement SEPs.  (Mem. in Opp'n 12.)  While that may be true, it is clear enough that the expenditure of the proposed $1.7 million for the two fire departments is far more beneficial to the surrounding communities than spending it on a futile sump project.

_____

[8] The SEP Policy states that mitigation can be impacted by "case-specific considerations."  <u>Id.</u> at 20.  There is no indication that the EPA or Hunt believed that any such considerations are present as to the two replacement SEPs, particularly because the SEPs received a mitigation percentage consistent with similar equipment purchase SEPs.

Third, despite Bayer's reduced monetary obligation under the consent decree as modified, the totality of the circumstances reveal that the proposed modification is no reprieve for Bayer. "[Bayer] has spent approximately $[2.2 million] on the [west sump] SEP" for which it sought no credit in consideration of renegotiating the proposed modification. (2017 Stewart Decl. ¶¶ 13, 20.)  Those costs, while not reflected in the consent decree as modified, will result in Bayer having spent $3.9 million - $2.2 million on the expanded west sump SEP plus the $1.7 million replacement SEPs - as opposed to the estimated $3.1 million on a completed west sump SEP.  Thus, the proposed modification enhances the punitive and deterrent elements of the consent decree.  Where that decree required Bayer to expend a total of $5.4 million, Bayer will have expended a total of $6.2 million if the proposed modification is approved.

Citizen Plaintiffs nevertheless argue that the proposed modification is a "windfall" for Bayer, weakening the settlement itself and correspondingly increasing the likelihood of future Clean Air Act Violations at the Institute Plant. (Mem. in Opp'n 11-12; Mem. in Supp. Intervene 20.)  Citizen Plaintiffs also suggest that recognizing Bayer's expenditures on the expanded west sump SEP creates perverse incentives for

companies in agreeing to and implementing SEPs.  (Mem. in Opp'n
13-14.)  In Citizen Plaintiffs' view, companies could be
duplicitous, "knowing that [they] would . . . be able to argue
for a reduced settlement."  (Id.)

        The court can envision a set of facts under which
Citizen Plaintiffs' concerns would ring true.  However, those
concerns are unfounded under the particular circumstances here,
where Bayer spent $2.2 million in diligent pursuit of its
obligations under the consent decree.  The court thus finds it
equitable to take those costs into account when considering
whether the proposed modification retains the decree's punitive
and deterrent elements.

        The court concludes that the proposed modification
adequately "preserve[s] the essence of the parties' bargain"
struck by the consent decree.  Thompson, 404 F.3d at 833.
Moreover, the United States and Bayer have limited the proposed
modification to the suitably tailored replacement of the west
sump SEP, which is all that is "necessary to approximate the
positions [they] would have occupied" had the west sump SEP been
fruitful.  Id. at 832.  Accordingly, the proposed modification
is suitably tailored in light of the problems presented by the
west sump SEP.

### IV. Conclusion

For the foregoing reasons, it is ORDERED that the United States' motion to enter the Second Modification of Consent Decree be, and hereby is, granted.  It is further ORDERED that the Second Modification of Consent Decree be, and hereby is, entered with the court's approval this same date.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER: July 26, 2018

John T. Copenhaver, Jr.
United States District Judge